Thomas S. Phillips *et al.*

*v.*

Robert Moir *et al.*

| 69 | 155' |
| 45a | 514 |
| 69 | 155 |
| 157 | 570 |
| 69 | 155 |
| 99a | [2]318 |
| 69 | 155 |
| 100a | [1]136 |

1. Former adjudication—*against agent, when binding on principal.* Where the plaintiff's commission merchant, who had purchased and delivered highwines in performance of the plaintiff's contract, who had

exercised due care and prudence in the matter, upon learning that the purchaser had shipped a part of the same, and was in the act of shipping the balance without payment, replevied the same, giving the plaintiff notice to prosecute the suits, which he failed to do, and the commission merchant was defeated in the suits, the bills of lading having been transferred to innocent purchasers, after which he paid over the proceeds of the wines he had replevied to the parties entitled to the same in the replevin suit: *Held,* in an action by the plaintiff against the commission merchant to recover the proceeds of the sale of the wines, that the plaintiff could not recover, as the adjudication in the replevin suits was binding on him, and showed that they belonged to other persons.

2. Factors—*degree of care required of.* Factors are only required to act with reasonable diligence and care in their employment. The known usages of trade and business enter into his employment, and if he conducts his business according to such usages, he will be exonerated from all responsibility.

3. Agency—*powers given to agent explained by usages of trade.* The usages of a particular trade or business are properly admitted for the purpose of interpreting the powers given to an agent or factor.

4. Commission merchant—*liability to principal for a loss.* Where the plaintiff had contracted for the sale and future delivery of a lot of high-wines, and his distillery being burned before he was called on for delivery, employed his commission merchant to purchase the same and deliver for him when demanded, and to draw on him for the price, which was done, the delivery being made according to the usage of trade, and the factor exercising due care and diligence to protect his principal's interests, and the purchaser having credit at the time, and it turned out that the wines were abstracted on the night of delivery before the proper vouchers could be produced on the following morning showing the payment of taxes and inspection, and the factor, after learning that the wines had been removed, took all reasonable steps to recover the same, but without success, it was *held,* that he was not liable to the plaintiff, his principal, for the loss.

Appeal from the Circuit Court of Cook county; the Hon. Henry Booth, Judge, presiding.

This was an action of *indebitatus assumpsit,* brought by Robert Moir & Co., the appellees, in the circuit court of Cook county, against Phillips & Carmichael, the appellants, to recover for money had and received from one Shufeldt, for 100 barrels of highwines sold to the latter, and claimed to have belonged to appellees.

The court below, a jury being waived, found for the plaintiffs, and rendered a judgment against the defendants for $7256, from which the defendants appealed.

The errors assigned question the finding of the court, and the judgment rendered thereon.

It appears from the record that, on the 19th day of June, 1870, Robert Moir, of the firm of Robert Moir & Co., distillers in Oquawka, Ill., was in Chicago and on the board of trade, of which he was a member. Phillips & Carmichael were commission merchants in Chicago, and had acted as brokers for Moir & Co. On that day, through one Wallace, a broker, at the request of Moir, the firm of Robert Moir & Co. sold to one Wilson Ames, doing business in wines and as a rectifier in Chicago, 200 barrels of highwines for $1.07 per gallon, the buyer having the right of calling for a delivery on three days' notice at any time between the 1st and 20th of July; to be delivered in 50 barrel lots, and a margin of $3 per barrel to be put up by each party. Thereupon Moir saw Ames, and taking him and Wallace to Carmichael, said that Phillips & Carmichael would attend to the matter, and see to putting up the margins. The margins on the part of both parties were deposited in the hands of Phillips & Carmichael. At the time the sale was made to Ames, Moir & Co. expected to fill the contract by delivering their own wines, if a call was made under the contract; but their warehouse and wines were destroyed by fire on the last day of June.

About the 10th of July, Moir was in Chicago, on his way East. He then told Phillips & Carmichael that, if the wines should be called for before they could be manufactured at Moir's distillery in Oquawka, to go into the market and buy and deliver them, drawing on Moir & Co. at Oquawka.

On the 15th of July, which was Friday, Ames demanded the delivery of 100 barrels on the 18th, the following Monday. Phillips & Carmichael immediately informed Moir & Co., at Oquawka, and were advised by them, on Saturday,

that they had not the wines at Oquawka, and that Phillips & Carmichael should buy and deliver.

On Monday, Carmichael went to Ames and told him of the burning of the wines, and proposed to settle with him at the market price of that day. Ames refused, on the ground that he wanted the wines to rectify. Thereupon, Carmichael went on the board of trade and bought, between 12 o'clock M. and 1 P. M., through a broker, 50 barrels from Conklin & Brothers, and 50 barrels from Lynch & Co., at 98 cents per gallon. He sent to each of them a written order to deliver 50 barrels at Ames' store on account of Moir, and collect $1.07 per gallon. Moir had instructed Phillips & Carmichael to have the wines delivered 'directly by the persons from whom they might buy, to Ames, so as to avoid two deliveries.

The wines of Conklin & Brothers were at the Rock Island depot, a mile or more from Ames' store, and those of Lynch & Co. were at their distillery, about the same distance from Ames' store. They commenced the delivery in the afternoon of Monday, and did not complete it until about six o'clock. During the afternoon, Phillips went twice to Ames' store, the first time about four o'clock, when he waited half or three-quarters of an hour, the second time, near six o'clock. Ames was not there, nor his book-keeper, nor any one except a porter, who rolled the barrels in the store as they were delivered. The object of going there was to make a tender of the wines on Ames' contract, and, as Carmichael says, to collect the amount due. The wines being about all delivered, Phillips went away, telling the man at the store he would leave the wines in his charge, and would be there as soon as he came down in the morning. The next morning, immediately after breakfast, Phillips went to Ames' store; neither Ames nor his book-keeper was there, and the wines were gone. It was immediately ascertained that a part had been sent to Detroit, and a part was at the Michigan Central depot. Phillips & Carmichael at once replevied the wines at the depot, and Phillips went to Detroit and replevied the wines there, and had

them sent back to Chicago. They then sold the wines at market price to Shufeldt, and made a special deposit of the money received from him with the Union National Bank. Meanwhile, Conklin & Lynch, following the instructions to collect from Ames, on the next morning after the delivery, about 9 or 10 o'clock, sent the account for the price for collection by clerks, but Ames could not be found, nor any other person from whom to collect.

Ames having procured two bills of lading from the Michigan Central Railroad Company dated July 19, 1870, each for 50 barrels of the wines shipped by him to be delivered in New York, went to the National Bank of Commerce, at the hour of opening, and procured the discount of two drafts, one for $2800 and the other for $2900, with the bills of lading as security.

Notice was given to Moir & Co. of the replevin suits directly after they were commenced, and they were requested to prosecute them, which they refused to do.

The National Bank of Commerce defended the suits. Phillips & Carmichael recovered in the circuit court of Cook county, but the bank brought the case to this court, where the judgment was reversed at the September term, 1871, (*M. C. R. R. Co.* v. *Phillips et al.* 60 Ill. 192,) this court holding that the bank had the better title to the wines. A similar judgment was rendered in the suit in Michigan; and under these judgments Phillips & Carmichael paid over to the Bank of Commerce the money they had received from Shufeldt on the sale of the highwines. This money is the subject of this suit.

The evidence shows that it was the universal custom in Chicago, when highwines were sold on 'Change on a given day to be delivered on that day, to deliver during the same afternoon to the purchaser, and the next morning the necessary papers, consisting of inspection certificates, government coupons identifying the wines and showing the payment of the government tax, the bill of sale and account, are presented to the purchaser, when he is required to pay. If the

purchaser requires it, the wines have to be inspected on his premises after the delivery. If he does not, then the seller has to furnish the certificate of the government inspection.

The testimony shows Ames to have been in good credit and standing until the 19th of July. On the 18th, before making the delivery, Phillips inquired of three different persons as to the responsibility of Ames, and received a favorable report, and learned that each of the parties was then actually delivering him wines.

Messrs. GOUDY & CHANDLER, and Messrs. LAWRENCE, WINSTON, CAMPBELL & LAWRENCE, for the appellants.

Mr. C. M. HARRIS, for the appellees.

Mr. JUSTICE SHELDON delivered the opinion of the Court:

The money sued for in this case was not that of the plaintiffs, but belonged to the National Bank of Commerce, as has been established by legal adjudication, made under such circumstances as to be binding upon the plaintiffs. The only ground of action which can be claimed against the defendants is, for the negligent delivery of the highwines to Ames, without collecting the price. And it is objected, that there can be no recovery for such a cause of action under a declaration in assumpsit containing the common counts only, as in this case, but that there must be a special count thereon. Passing over this objection, we will consider the question as to the liability of the defendants under any form of declaration which might be framed.

The rule in regard to factors and brokers is familiar, that they are only required to act with reasonable diligence and care in their employment. Story on Agency, sec. 186.

The known usages of trade and business, too, enter into the engagement of the agent, and if he conducts his business according to such usages, he will be exonerated from all responsibility. Id. sec. 96.

It seems impossible, on an examination of the evidence in this record, to come to any other just conclusion than that Phillips & Carmichael fully performed the duty arising out of their employment as agents. So far as we can perceive, they used all the diligence and care that a prudent man would have used under like circumstances in the transaction of his own affairs.

In making the delivery to Ames without receiving simultaneous payment, they were justified by the usage of the particular trade or business prevailing in Chicago.

We see no pretext of a ground upon which to charge the appellants with a liability in this case, except the one of a violation of orders. There is some evidence in the record tending to show a disobedience of instructions.

Moir testifies that, at the time he was in Chicago, on his way East, about the 10th of July—when he instructed Carmichael how to act in the event of the wines being called for before Moir & Co.'s wines reached market—wines had at that time declined from the time the sale had been made, and he insisted upon an increased margin being put up; that it was the understanding of Moir and Wallace that the margin was to be kept good; that, on application to Ames to increase it, the latter said he distinctly understood that he was to put up but $3 as margin, and declined to increase it; that thereupon Moir walked over to where Carmichael was transacting business, and said: "Mr. Carmichael, this man is putting a different construction on the contract from what I think he ought to put. Don't trust a dollar's worth of our property in his hands without getting your pay for it;" that Carmichael gave assurances to witness he would not. Carmichael positively denies that Moir said anything of the sort.

Phillips swears that, on the same day when Moir was in Chicago, on his way East, he said to Moir, in case it was necessary, to buy in the wines and deliver them, that there was some little risk in delivering wines; that they did not know Ames at all; never had a transaction with him ; to

11—69TH ILL.

which Moir replied that we must be as careful as possible; that that was about the sum and substance of the conversation. Moir denies this conversation.

Here is not a preponderance of testimony for the plaintiffs to recover upon. The reason, too, assigned by Moir for giving the direction did not truly exist, for the contract, in plain words, only required a margin of $3 per barrel, which had been put up, and there was no just cause for censure or suspicion of Ames on that ground.

But even if Moir did say to Carmichael what the former testifies, we can not admit that there would be ground for a recovery.

What would have been meant and understood by Moir's direction not to trust a dollar's worth of his property in Ames' hands without getting pay for it? It certainly should not have been taken in its literal meaning, that Moir was to get his pay for each barrel, or each dray-load of highwines, as it was delivered. That would be impossible. Phillips & Carmichael had no right to demand payment until they had delivered the wines, had them inspected on the premises, if required by the purchaser, and furnished the inspection certificate and coupons. The article was bulky, and had to be delivered in successive dray-loads from the distance of a mile. Phillips went twice to Ames' store during the afternoon while the delivery was going on, in order to protect Moir & Co.'s interest, remaining there the second time until about six o'clock, when the wines were nearly all delivered.

Up to this point it can not be said that Phillips & Carmichael had failed in their duty, or departed from their instructions, if they ever received any. Not meeting with Ames at that time, what was then the duty of Phillips? It would have been well nigh impossible for him at that time to withdraw the wines from Ames' store, and place them elsewhere in safety. But, could he have done so, it would have been imprudent to remove the wines, in due regard to Moir & Co.'s interest, so far as Phillips could then judge. Ames,

at that time, was in good credit.   He might claim the right to insist on the established custom in regard to the sale and delivery of highwines.   There was nothing in the contract of sale made by Moir & Co. with Ames to take the sale from the operation of the custom.   Phillips could not know but that Ames would require to have the wines inspected on his premises, as he was entitled to have done, by the custom.   He was entitled, by the custom, to have the certificate of inspection and the government coupons identifying the wines and showing the payment of the tax, delivered to him with the bill. The custom was, not to deliver these papers, and not to pay for the wines, until the morning after their delivery.   If, then, Phillips, on that night of the 18th, had removed the wines, it would have been, as he might reasonably suppose, at the hazard of discharging Ames from his contract, and of Moir & Co. losing the margins of $600 which they had put up, and their 9 cents per gallon, the difference between the price at which they sold and that at which they had purchased.

The only course for Phillips to take, with a view to protect the interests of Moir, would seem to be the one he did take.

He placed the wines in the care of the porter in the store, to be kept until the next morning, and the next morning he was there for the payment.   In the meantime the wines had been abstracted.

The loss was not attributable to the pecuniary condition of Ames, but to the fact that he was a dishonest man.

The special instruction claimed as having been given by Moir, as before remarked, could not have been intended to be taken literally.   The language of it requires construction, and it must have a reasonable construction.

The usages of a particular trade or business are properly admissible for the purpose of interpreting the powers given to an agent.   Story on Agency, sec. 77.

The only reasonable construction to be placed on the language of such instruction, under the circumstances, would

seem to be that Phillips & Carmichael were not to give Ames any indulgence, but to insist on prompt payment according to the existing usage and custom; that they were not to trust Ames with the possession of the wines beyond the customary course of delivery, and except to that degree that it was necessary to trust him, in order to make a good delivery, and enable Moir & Co. to collect their purchase money and save the forfeit of the margins which they had put up. To have required anything more, we incline to think the direction should have been more specific, showing an unmistakable intention to depart from the known usage and custom of the particular trade, and the particular wherein the variation should be. The appellants did not trust the wines to Ames without payment, any further than was in strict accordance with the known usage and custom of the business, and than seemed necessary under the circumstances, and under a contract which was of the appellee's own making.

We regard the finding of the court below as unwarranted by the evidence, and the judgment must be reversed.

*Judgment reversed.*

Mr. JUSTICE WALKER: I can not concur in the conclusion reached by the majority of the court.