# THE UNION STOCK YARD AND TRANSIT COMPANY

*v.*

## MALLORY, SON & ZIMMERMAN COMPANY.

*Filed at Ottawa October 11, 1895.*

1. TROVER—*plaintiff must recover on strength of his own title.* Plaintiff in trover must recover upon the strength of his own title, and must show not only a tortious conversion of the property by defendant, but that at the time of such conversion he had the right of property, generally or specially, in the chattels converted, and also the possession or the right thereof.

2. SAME—*not maintainable by seller of property who has made constructive delivery.* A seller of cattle, who has made constructive delivery thereof, cannot maintain trover against a stock yards company for the wrongful delivery of such cattle to one who assumed to be the agent of the purchaser.

3. SAME—*what is a conversion.* A conversion is any unauthorized act which deprives a man of his property, permanently or for an indefinite time.

4. SAME—*effect of demand and refusal—when no demand is necessary.* Demand and refusal do not necessarily constitute the conversion of chattels, but are only evidence of it, and no demand is necessary to the maintenance of an action of trover where an actual conversion has already taken place.

5. AGENCY—*what will, in law, create a constructive agency.* One who holds out another as his agent, and who, by his course of dealing, justifies the inference that such other is authorized to act as his agent, will not be heard to deny the agency to the prejudice of an innocent party, who has been led to rely upon such agent's authority.

6. SAME—*previous course of dealing to enlarge agent's authority.* A previous course of dealing, as between a principal and his agent, may be shown to establish that whenever such agent had authority to purchase property, he had also, by such course of dealing, authority to receive such property from the seller.

7. SALES—*what is a good constructive delivery.* Delivery by the seller to the purchaser, or his authorized agent, of an order upon the seller's bailee to deliver the goods sold, to such purchaser or agent, is a constructive delivery of the property, and has the same effect in transferring the title as delivery of the property itself.

8. SAME—*effect of fraudulent intention not to pay for goods purchased—rescission—innocent purchaser.* Where fraud in the sale of goods arises from misrepresentations of the purchaser, or from his intention not to pay for the goods, the sale is not void, but voidable only,

and the vendor's rescission for that cause, to be effective, must be made before other rights have been acquired in the property.

9. If, before the vendor rescinds in such case, the vendee makes a transfer to an innocent third person for a valuable consideration, such third person will hold the property.

10. SAME—*delivery of cattle by agister to agent of purchaser—effect of vendor's knowledge.* While knowledge by a seller of cattle that one claiming to be the agent of the purchaser had been recognized as such is essential to the validity of the sale, it has no bearing upon the right of an agister of the cattle to deliver them to such agent upon an order from the seller to deliver them to such purchaser.

11. BAILMENT—*liability of stock yards company as agister of cattle.* A stock yards company, which acts as agister of cattle, is only required, in the matter of the care and delivery of such cattle, to exercise reasonable care and diligence, in accordance with the usages and customs at its yards.

*Union Stock Yard Co.* v. *Mallory, etc. Co.* 54 Ill. App. 170, reversed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

Samuel Fleischman, for a year or two prior to May 14, 1890, was a cattle buyer at the Union Stock Yards in Chicago. He did an extensive business, chiefly in acting as buyer or agent for butchers and cattle dealers who resided outside the city of Chicago. One of the persons for whom he so acted was Walter Bussell, of Detroit. The business was conducted about as follows: Bussell would notify Fleischman, by letter or wire, when he desired cattle. Fleischman would go into the yards, pick out such cattle as, in his opinion, suited the requirements of his principal, negotiate with the commission man to whom the cattle desired by Fleischman had been consigned, and, if the price of the cattle was satisfactorily arranged, buy them. Thereupon the commission man and Fleischman would go to the weighmaster of the stock yard company, by whom was made out a scale ticket, giving the number and weight of the cattle, from whom purchased, to whom weighed, and containing other

memoranda respecting the sale, which was delivered to the seller. The scale ticket was then taken by the seller to his office, and the price of the cattle sold being paid by the buyer or agent, or a credit given for the price thereof, the seller gave to the buyer an order upon the stock yard company to deliver the cattle so sold. Upon presentation of this order to the stock yard company, or its employees in charge of deliveries of cattle, the cattle mentioned in the order were turned over to the buyer or agent for shipment or other disposition, as will be mentioned later. Fleischman had acted as the agent of Bussell in the purchase of cattle, in the way described, for a period of something over one and less than two years,— say fifteen to eighteen months prior to May 14, 1890. During this time he also purchased cattle for other nonresident butchers and cattle dealers, notably H. Phillips and L. Fleischman.

On May 13, 1890, Bussell, at Detroit, telegraphed to Fleischman, at Chicago, to buy him (Bussell) "a load of cattle, if just right,—if they are my kind and come right." On the morning of May 14, 1890, Fleischman told Zimmerman, of the plaintiff company, that he had an order from Bussell for cattle, and between nine and ten o'clock on that day the plaintiff, acting through Zimmerman, sold to Fleischman twenty-seven head of cattle, and delivered to Fleischman an order, as follows:

"CHICAGO, *May 14, 1890.*
"*Union Stock Yard and Transit Co.:*
"Please deliver to . . . . . . . . Bussell 27 cattle, . . . . .hogs, . . . . . .sheep. Block. . . ., pen. . . ., division D, scale 5.
MALLORY, SON & ZIMMERMAN CO.,
Per WM. BUHLMAN."

Fleischman took the order, and later in the day sold the cattle mentioned therein to Holmes & Pattison, a commission firm doing business at the stock yards, and going to the scales used in connection with the block and

pen where were the cattle, with a representative of the firm of Holmes & Pattison, endorsed the order as follows: "To Holmes & Pattison.   Bussell.—S. Fleischman." Thereupon the twenty-seven cattle mentioned in the order were delivered to Holmes & Pattison by the stock yard company.   On the next day the officers of the plaintiff company heard rumors to the effect that Fleischman had run away, and thereupon Zimmerman and Mallory, officers of appellee company, went to the Transit House, where Fleischman lived, for the purpose of learning "whether he was going to pay for the cattle," but did not succeed in finding him there, nor, indeed, so far as appears, did they ever find him.   Not finding Fleischman at the Transit House, the plaintiff company made out and forwarded the following bill and letter to Bussell, at Detroit:

"U. S. YARDS, ILL., 5/14, 1890.
"*Office of Mallory, Son & Zimmerman Co.*
   "Sold Wm. Bussell:

| Date. | Cattle. | Hogs. | Sheep. | Weight. | Off. Price. | Amount. |
|-------|---------|-------|--------|---------|-------------|---------|
| 5 14  | 6       |       |        | 6,150   | 3.10        | $190 65 |
|       | 3       |       |        | 3,170   | 3¼          | 103 02  |
|       | 2       |       |        | 2,250   | 4c.         | 90 00   |
|       | 9       |       |        | 7,580   | 3.65        | 276 67  |
|       | 3       |       |        | 1,500   | 3c.         | 45 00   |
|       | 3       |       |        | 2,200   | 3.40        | 108 80  |
|       | 1       |       |        | 950     | 3.40        | 32 64   |
|       | 27      |       |        |         |             | $846 78 |

"DEAR SIR—We sold the above cattle to S. Fleischman for your acct. on the date as above, but have not rec'd payment for same.   Please remit at once, and oblige.
         "Yours respy.,
                MALLORY, SON & ZIMMERMAN CO.
                    Per BRYANT."

The first thing Bussell appears to have done on receiving this communication was to consult an attorney, who replied as follows:

"DETROIT, *May 27, 1890.*

"*Messrs. Mallory, Son & Zimmerman Co., Union Stock Yards, Chicago:*

"GENTLEMEN—In reply to your favor of the 14th inst., to Walter Bussell, he wishes me to say that he has neither ordered nor received from Mr. Fleischman the bill of cattle covered by your memorandum, nor anything like it, and he therefore will decline to pay the account. Fleischman must have bought that lot for some one else, or at all events turned them over to some one else.

"Yours, very truly,     W. M. LILLIEBRIDGE."

The next step taken by the plaintiff company was to forward to the stock yard company the following communication:

"UNION STOCK YARDS, Ill., *May 23, 1890.*
"*Union Stock Yard and Transit Co.*

*To Mallory, Son & Zimmerman Co., Dr.*

"To twenty-seven cattle, as per bill attached, $846.78. These cattle were sold to S. Fleischman May 14, for account of Wm. Bussell, Detroit, and we gave the order to Wm. Bussell direct. Your employees delivered the cattle to other parties, and as Mr. Bussell did not get the cattle he refuses to pay for them, and as you delivered the cattle to others than Wm. Bussell we look to you for the amount. Please adjust the same at once, and oblige.

MALLORY, SON & ZIMMERMAN CO.,
Per C. A. MALLORY, *Treas.*"

The bill mentioned in the letter was the same as that above set forth in the letter of May 14 to Bussell. The following reply was thereupon made by the defendant company, appellant in this court:

"UNION STOCK YARDS, CHICAGO, *May 24, 1890.*
"*Mallory, Son & Zimmerman Co., Union Stock Yards, City:*

"GENTLEMEN—Referring to your claim of $846.78, under date of the 23d instant, account of alleged wrong delivery of cattle by the employees of this company, would say, that I find, upon examination of your order,

that these cattle were properly delivered on it, as directed, and consequently we can assume no responsibility in the matter.

"Very respectfully,    James H. Ashby, *Gen. Sup.*"

Subsequently, and on June 18, 1890, formal demand for the possession of the twenty-seven cattle was made by the plaintiff company upon the defendant company, and at a later period an action of trover for the conversion of the twenty-seven cattle was commenced by the appellee against the appellant, and proceeded to judgment for $1004.25, being the sum for which the twenty-seven cattle were sold, and interest thereon from the date of sale to the date of trial, and from that judgment the stock yard company has appealed, first to the Appellate Court for the First District, and, on the affirmance there of the judgment of the court below, to this court.

Winston & Meagher, for appellant:

If the title to the twenty-seven head of cattle had passed when the trade between the plaintiff and Bussell was consummated, this action cannot be maintained, and the judgment must be reversed.    *Owens* v. *Weedman*, 82 Ill. 409; *Frink* v. *Pratt*, 130 id. 327; *Eisendrath* v. *Knauer*, 64 id. 396; *Conklin* v. *Leeds*, 58 id. 178.

The usages of a particular trade or business are properly admissible for the purpose of interpreting the powers given to an agent.    *Furnace Co.* v. *Keystone Co.* 110 Ill. 431; *Phillips* v. *Moir*, 69 id. 155; Story on Agency, sec. 77.

Peck, Miller & Starr, for appellee:

A custom, in order to be binding, must be proved to exist, and must be proved to be (1) immemorial; (2) continued; (3) peaceable; (4) reasonable; (5) certain; (6) compulsory; (7) consistent; and must, when allowed, receive a strict construction.    Blackstone's Com. 76, 79.

This is the law in Illinois.    *Dixon* v. *Dunham*, 14 Ill. 324. See also numerous cases cited in Kinney's Digest, 694.

The fraud of Fleischman vitiated the purported sale which Bussell declined to recognize, and left the title to the property unaffected by the negotiations. *Hardman* v. *Booth*, L. R. 2 H. L. 325; 1 Kerr's Benjamin on Sales, book 3, chap. 2, sec. 532, *et seq.; Doane* v. *Lockwood*, 115 Ill. 490; 2 Morse on Banks, (3d ed.) sec. 474 *a; Van Bibber* v. *Bank*, 14 La. Ann. 481; *Dodge* v. *Bank*, 19 Ohio St. 526.

When a party is intrusted with the goods of another, and transfers them to another without orders, it is a conversion. *Syeds* v. *Hay*, 4 Fed. Rep. 260.

If a bailee by mistake delivers goods to the wrong person he is liable in trover. (*Stevenson* v. *Hart*, 4 Bing. 476.) So with a wharfinger or other bailee. *Devereaux* v. *Barclay*, 2 B. & A. 702; *Price* v. *Railroad Co.* 50 N. Y. 213; *Adams* v. *Blankenstein*, 2 Cal. 413; *Winslow* v. *Railroad Co.* 42 Vt. 700.

Proof of the fact that a person, on former occasions, had recognized another as an agent in making purchases for him, is not sufficient to charge him for a purchase afterwards made by such person claiming to act as his agent, without proof that at the time of such subsequent purchase the vendor was cognizant of such former acts of recognition. *Maxey* v. *Heckethorn*, 44 Ill. 437; *Boyd* v. *Yerkes*, 25 Ill. App. 527; *Roche* v. *Day*, 20 id. 417; *Burroughs* v. *Comegys*, 17 id. 653; *Ayer* v. *Mead*, 13 id. 625; *Railroad Co.* v. *Horan*, 131 Ill. 288; 1 Starkie on Evidence, (7th Am.ed.) *58.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

This is an action of trover, brought by the appellee, Mallory, Son & Zimmerman Company, an incorporated company of live stock commission merchants, doing business at the stock yards in the city of Chicago, against the appellant, the Union Stock Yard and Transit Company, to recover the value of twenty-seven head of cattle, alleged to have been converted by the appellant. In an action of trover, which is a possessory action, the plain-

tiff must recover upon the strength of his own title and not upon the weakness of his adversary's title; and he must show not only a tortious conversion of the personal property by the defendant, but also that, at the time of the alleged conversion, he had the right of property, general or special, in the chattels converted, and also the possession, or a right to the immediate possession thereof. There must be a concurrence both of the right of property, general or special, and of the actual possession or the right to immediate possession, and this concurrence must exist at the time of the conversion. (*Davidson* v. *Waldron*, 31 Ill. 120; *Forth* v. *Pursley*, 82 id. 152; *Owens* v. *Weedman*, id. 409; *Montgomery* v. *Brush*, 121 id. 513; *Frink* v. *Pratt*, 130 id. 327; 26 Am. & Eng. Ency. of Law, p. 744).

There is evidence in the record tending to show, that the title to the cattle had passed out of appellee when the alleged conversion took place, and that both the right of property and the right of possession were in Bussell, when the cattle were delivered by appellant to Fleischman, or to Holmes & Pattison at Fleischman's request. On May 13, 1890, which was Sunday, Bussell in Detroit telegraphed to Fleischman at the stock yards in Chicago to buy a load of cattle for him. Early on the next morning, Monday, May 14, 1890, Fleischman went to Zimmerman, a member of the appellee company, and told him of the telegram thus received from Bussell. Fleischman and Zimmerman together visited the cattle pens of appellant between nine and ten o'clock on that morning, and there looked at several bunches of cattle held for appellee by appellant, and agreed on the price of twenty-seven head of cattle. Zimmerman caused the cattle so selected to be taken by one of his employees to the scales in the yard, and weighed by appellant's weighmaster, who made out the scale tickets, showing the number and weight of the cattle, and the names of the seller and of the person to whom they were weighed. The scale tickets are in evidence, and show the names of appellee and of Bus-

sell, and are signed by the weighmaster of appellant. Fleischman was present when the cattle were weighed, or when Zimmerman directed them to be carried to the scales to be weighed. The scale tickets were taken to appellee's office, and there appellee made out and signed and delivered to Fleischman an order on appellant to deliver to Bussell the twenty-seven head of cattle. On the same day Fleischman presented this order to appellant, and appellant delivered to him the cattle. It was not the business of appellant to buy and sell cattle, but the appellant operated the stock yards; and its business is to receive stock and weigh it, and see that it is properly fed and watered. Appellee's business was to sell stock on commission, and sometimes buy it on order, and it had been engaged in that business at the stock yards for some twenty-two years, having dealings with appellant every day in the year except Sunday. Fleischman also had been buying stock for more than a year at the stock yards for Bussell and other parties, and had had dealings with appellee before May 14, 1890.

The testimony of both Zimmerman and Mallory, the former being the salesman of appellee, and the latter its treasurer and manager, is that there was a sale of the cattle to Bussell when the delivery order was given to Fleischman, and that appellee then extended upon its books a credit of a few days, or perhaps a week, to Bussell. There was a symbolical delivery of the cattle by appellee to Fleischman, and, therefore, an execution of the contract of sale. When the vendor delivers to the purchaser, or to the purchaser's authorized agent, an order upon the vendor's bailee to deliver the goods sold to such purchaser or agent, there is a constructive delivery of the property; and the delivery of the order vests the purchaser with the indicia of ownership, and has the same effect in transferring the title to the property as the delivery of the property. (*McCormick* v. *Hadden*, 37 Ill. 370; *Burton* v. *Curyea*, 40 id. 320; *Webster* v. *Granger*, 78

id. 230; *Tuxworth* v. *Moore,* 9 Pick. 347; *Carter* v. *Willard,* 19 id. 1). It follows, that the title to the cattle passed from appellee to Bussell; and, if the title remained in Bussell at the time of the alleged conversion of the property, then this action was improperly brought in the name of appellee, and cannot be maintained.

If there was a conversion, it must be regarded as having taken place on May 14, 1890, when the cattle were delivered by appellant to Fleischman, and not on June 18, 1890, when appellee made a formal written demand upon appellant for the possession of the property. In trover, demand and refusal do not necessarily constitute the conversion, but are only evidence of it. A conversion is any unauthorized act, which deprives a man of his property permanently or for an indefinite time, and, when such a conversion has taken place, a demand is not necessary. A wrongful assumption of the ownership of property may be a conversion in itself, and render a demand and refusal unnecessary. Demand and refusal are evidence of conversion when the defendant is in such a condition, that he can deliver the property if he will. (*Johnson* v. *Howe,* 2 Gilm. 342; *Bruner* v. *Dyball,* 42 Ill. 35; *Hiort* v. *Bott,* L. R. 9 Exch. 86; *Hawkins* v. *Hoffman,* 6 Hill, 586; 41 Am. Dec. 767, and notes). It is not claimed by appellee, that appellant delivered the cattle to Fleischman on May 14, 1890, with any evil intent, or from any improper motive, or that it thereby acted with a want of good faith. If appellant was then guilty of a conversion, it must be because it parted with the cattle through mistake, or negligence. It was certainly justified at that time in regarding Bussell as the owner of the cattle and entitled to the possession thereof, and in concluding that the right of property and of possession had both passed from appellee. The trial court refused to instruct the jury, at defendant's request, that, to maintain this action, the plaintiff must recover on the strength of its own title to the cattle, and show in itself either a general or special

property therein, and that, at the time of the alleged conversion, it had not only the right of property in the cattle, but also the right to the immediate possession of the same.

It is claimed, however, that the sale from appellee to Bussell through Fleischman was fraudulent. Fleischman is alleged to have been a special agent and not a general agent of Bussell. A general agent is one who is authorized to do all acts connected with a particular business or in a particular place, while a special agent is one who is empowered to act only in a specific transaction. (Mechem on Agency, sec. 6; 1 Am. & Eng. Ency. of Law, page 349). Fleischman is said to have had no authority to buy cattle for Bussell except when he received an order to buy a particular lot of cattle, and that his authority to make purchases of cattle was limited to the particular order received by him. It is then contended, that he received an order by telegraph sent on May 13, 1890, to buy cattle; that, on May 14, 1890, he bought a lot of cattle from another party than appellee, and shipped them to Bussell, and drew on Bussell for the purchase money, and that Bussell paid for the cattle so purchased and shipped to him. Appellee contends, that Fleischman had exhausted his authority to buy for Bussell when he told Zimmerman that he had an order from Bussell, and that he obtained the cattle from appellee without having any authority from Bussell to do so, and without having any intention to pay for the same, and that his conduct in thus obtaining the cattle from appellee and subsequently selling them to Holmes & Pattison, instead of shipping them to Bussell, was a fraud on appellee.

Whether the purchase of the cattle from appellee was made by Fleischman before or after the other purchase was made by him, may be considered doubtful under the evidence, if it were proper to consider the evidence. If he bought of appellee under the order received by him and before his authority was exhausted, then it cannot be

said that there was any fraud in the original purchase of the cattle from appellee, but only in the subsequent disposition of them to Holmes & Pattison.

It may be conceded, however, that the question, whether the sale of the cattle by appellee to Bussell was fraudulent or not, was a question of fact to be determined by the jury under proper instructions, and that the judgment of the Appellate Court establishes the fraudulent character of the sale as between appellee and Bussell or Fleischman. Bussell denies, that he gave Fleischman any authority to buy this particular lot of cattle from appellee. One, who holds out another as his agent to act for him in a given capacity, and, by his habits and course of dealing, justifies the inference that such other is authorized to act as his agent, whether it be in a single transaction or in a series of transactions, will not be heard to deny the agency to the prejudice of an innocent party, who has been led to rely upon the appearance of authority in the agent. (Mechem on Agency, secs. 83, 84). Whether or not Bussell's conduct towards Fleischman was such as to justify appellee in dealing with Fleischman as having authority to act for Bussell, is a question which seems to be immaterial except so far as it concerns the validity of the sale, because this is not a suit by appellee against Bussell. Nor does the question here arise whether or not Holmes & Pattison were *bona fide* purchasers of the goods from Fleischman, as this is not a suit against Holmes & Pattison. This suit is brought by appellee against the appellant, its bailee or agister, charging the latter with having improperly delivered the goods to Fleischman when the delivery order directed them to be delivered to Bussell.

Where a sale of goods is made through the fraudulent representations of the purchaser, or where the fraud in the sale arises from the intention of the purchaser not to pay for the goods, the sale is voidable only, and not absolutely void. (8 Am. & Eng. Ency. of Law, pages 791,

822, 823; Benjamin on Sales, bk. 3, chap. 2, sec. 433.) The sale being voidable, it results that the vendor may rescind it if he so elects. But this rescission must be made before other rights acquired in good faith have intervened. If, before the vendor exercises his election, the vendee makes a transfer to an innocent third person for a valuable consideration, such third person will hold the property as against the original vendor. (*Brundage* v. *Camp*, 21 Ill. 330; *Fawcett* v. *Osborn*, 32 id. 411; *Butters* v. *Haughwout*, 42 id. 18; *Chicago Dock Co.* v. *Foster*, 48 id. 507; *Doane* v. *Lockwood*, 115 id. 490; *Farwell* v. *Hanchett*, 120 id. 573; 2 Schouler on Personal Prop. secs. 408, 409; Benjamin on Sales, sec. 433; 26 Am. & Eng. Ency. of Law, page 786, and notes).

In the case at bar, it is indisputably shown, that the appellee exercised no election to rescind the sale before the cattle were delivered to Fleischman upon the order given to him by appellee. "The title of the fraudulent purchaser is subject to be divested, at the election of the seller, within any reasonable time after the fraud is discovered." (*Doane* v. *Lockwood*, *supra*). Here, the fraud was not discovered until after the alleged conversion took place. This being so, the title was still in Bussell at the time of the conversion, and had not become revested in appellee by rescission.

We are, therefore, inclined to hold, that the jury should have been instructed upon this subject in accordance with defendant's request as above indicated.

It is said, however, that the point as to the existence of the title in Bussell at the time of the conversion is merely technical; and that it is immaterial whether appellant should be made to respond for the value of the cattle to appellee or to Bussell. Without conceding that there is any force in this suggestion, we will notice some of the other errors assigned.

By the fifth instruction given for the plaintiff, the jury were told that "proof of the fact, if it be a fact, that

Bussell had on former occasions recognized Fleischman as his agent in making purchases of cattle for him is not sufficient to charge him, or justify the Union Stock Yard and Transit Company in delivering cattle to Fleischman for Bussell when they had an order from the plaintiff to deliver to Bussell himself, without proof that, at the time of the transactions in question, the plaintiff had knowledge of such former recognition." The court refused to give the fifth instruction asked for the defendant which is as follows:

"The jury are instructed that a person dealing at a particular market will be taken to have dealt according to the custom and usage of that market, and if he employs another to act for him in carrying on business dealings at such market, he will be held as intending that the business should be conducted according to the general usage and custom of such market; and this is the rule, whether he in fact knows of the custom or not."

It is assigned as error, that the court gave the fifth instruction asked by the plaintiff, and refused the fifth instruction asked by the defendant. In connection with these instructions it may be noted, that the defendant below offered in evidence six orders on appellant for the delivery of cattle to Bussell, signed by different commission merchants at the stock yards, and delivered to Fleischman, which orders were endorsed in the handwriting of Fleischman in the same manner in which the order for the twenty-seven cattle signed by appellee was endorsed, and upon the presentation of which orders to appellant the cattle therein named had been delivered to Fleischman or to Pattison & Holmes. The court refused to admit the orders in evidence, and this refusal is assigned as error. The object of introducing these orders was to show, that Fleischman had been in the habit of presenting to appellant orders directing cattle to be delivered to Bussell, and of endorsing the orders and receiving the cattle and shipping them or selling them;

and that it was the usual custom at the stock yards to transfer the title to the cattle by endorsement of the delivery orders, and that cattle were delivered upon such orders to the party therein named or to his known agent. The ground, upon which the court refused to admit the orders, was that the plaintiff was not shown to have had knowledge of them; and the necessity of such knowledge by the plaintiff is also set up in the given instruction No. 5.

The instruction was correct in requiring knowledge of the orders by the plaintiff, so far as they bore upon the question whether or not Fleischman was Bussell's agent to purchase the cattle, and had authority to make the contract of sale with appellee. Upon this subject counsel for appellee cite the case of *Maxey* v. *Heckethorn,* 44 Ill. 437. There, Heckethorn sued Maxey and Howard for cattle alleged to have been purchased by one Hewitt as Maxey's agent. It was sought to hold the defendants there liable on the ground, that, in previous transactions, they had recognized Hewitt as their agent or as Maxey's agent, and it was held that Maxey's recognition of previous acts of purchase for him by Hewitt was not sufficient to charge Maxey and Howard, in the absence of proof that the plaintiff, before he sold to Hewitt, was cognizant of the facts. Unless the previous transactions were brought home to the knowledge of Heckethorn, he could not claim that he sold the stock to Hewitt as Maxey's agent because of said transactions. So, here, it may be said that Bussell could not be held liable to appellee for the purchase of the cattle by Fleischman as his agent because Bussell had recognized previous purchases of cattle made for him by Fleischman, unless it was shown that plaintiff had knowledge of such previous purchases. Appellee could not be held, without such knowledge, to have relied upon such previous purchases as showing Fleischman's agency. But all this has reference to the right or authority of Fleischman to make a contract with appellee for the purchase of the cattle; it

concerns only the validity of the contract of sale.   But, so far as appellant is concerned, the question is, not whether Fleischman was Bussell's agent to buy the cattle of appellee, but whether, after the purchase of the cattle was made, Fleischman had authority to receive them as Bussell's agent.   Appellant had nothing to do with the purchase of the cattle.   When the delivery order was presented, appellant had a right to suppose that appellee had made a valid sale of the cattle to Bussell, and had determined that Fleischman had proper authority from Bussell to buy them.   The only question for appellant to consider was this : the cattle having been sold to Bussell and he being the rightful owner, has Fleischman authority to receive them for Bussell, and ought they to be delivered to Fleischman for Bussell.   It is easy to see, that the agency of Fleischman is to be looked at in two aspects: first, was Fleischman Bussell's agent to buy the cattle?—this was a question for appellee to settle ;   second, after the cattle were bought, was Fleischman Bussell's agent to receive the cattle?—this was a question to be determined by appellant.   If, in previous transactions with appellant, Bussell had recognized Fleischman as his agent to receive cattle already bought by him, appellant might be justified in dealing with Fleischman as Bussell's agent for such purpose.   In such case, the knowledge of appellee as to transactions, previously had with appellant showing Fleischman's agency to receive cattle already bought, was not material.   The knowledge of appellee was only material as to previous transactions tending to show Fleischman's authority as agent to make contracts for the purchase of cattle.   There is thus a plain distinction between the question of Fleischman's agency to buy cattle as related to the validity of the sale thereof, and the question of Fleischman's agency as to the delivery to him of cattle which had already been bought.   Whether Fleischman was a general or special agent, the evidence tends very

conclusively to show, that, when he had an order from Bussell to buy cattle, and after he had bought them in pursuance of such order, he had full authority to receive them from the stock yards company upon the presentation to that company of a proper delivery order. We are, therefore, inclined to think, that the fifth instruction given for plaintiff was erroneous, in so far as it makes the justification of appellant in delivering the cattle to Fleischman dependent upon appellee's knowledge of Fleischman's agency; and that the six orders in question should have been admitted in evidence; and that the fifth instruction asked by defendant below should have been given. The latter instruction conforms exactly to the ruling made by this court in *Samuels* v. *Oliver*, 130 Ill. 73. The usages of a particular trade or business are properly admissible for the purpose of interpreting the powers given to an agent. (*Phillips* v. *Moir*, 69 Ill. 155; *National Furnace Co.* v. *Keystone Manf. Co.* 110 id. 427).

The liability of the appellant was that of bailee or agister. Agisters of cattle are only bound for the exercise of ordinary care. (*Umlauf* v. *Bassett*, 38 Ill. 96; Story on Bailments, 443). The degree of care exercised is a question of fact for the jury. (*Mansfield* v. *Cole*, 61 Ill. 191). The ordinary rule is that, if a bailee deliver goods to the wrong person, although innocently or by mistake, he is liable as for a conversion. (Schouler on Law of Bailments, p. 119; *Ala. & Tenn. River Railroad Co.* v. *Kidd*, 35 Ala. 209). And if one man, who is intrusted with the goods of another, puts them into the hands of a third person contrary to orders, he is liable. (*Parker* v. *Lombard*, 100 Mass. 405). But it is not a conversion if the bailee, being intrusted with the possession merely, transfers the possession according to the directions of the person from whom he received it. (*Parker* v. *Lombard, supra*). Nor will trover lie where the conversion is with the knowledge or consent of the plaintiff. (*Tousley* v. *Board of Education*, 39 Minn. 419). Where the property is to be delivered by an ordi-

nary bailee, and not by a carrier, the liability is only for proper diligence and care in the preservation and delivery of the property; and the question whether the defendant has been negligent in the delivery of the property is a question of fact for the jury. (*Price* v. *Oswego and Syracuse Railroad Co.* 50 N.Y. 213; Benjamin on Sales, sec. 437; *Heugh* v. *London & N. W. Railway Co.* L. R. 5 Exch. 51; *McKean* v. *McIvor*, L. R. 6 Exch. 36; *Clough* v. *London & N. W. Railway Co.* L. R. 7 Exch. 26).

The trial court refused to give the seventh instruction asked by the defendant below, which told the jury, that, in the matter of the care and delivery of the cattle, the defendant was only required to act with reasonable care and diligence, and in accordance with the usages and custom of carrying on business at the Union Stock Yards. We think that this instruction should have been given.

For the errors herein mentioned, the judgments of the Appellate and circuit courts are reversed, and the cause is remanded to the circuit court for further proceedings in accordance with the views herein expressed.

*Reversed and remanded.*