11906

CARR *ET AL.* v. MORAGNE

(131 S. E., 424)

1. PRINCIPAL AND AGENT—WHOLESALE HOUSE MAY RECOVER AGAINST DEFENDANT, ALTHOUGH GOODS ORDERED THROUGH SALESMAN BY SON, NOTWITHSTANDING COMPLAINT MAKES NO MENTION OF AGENT.— Wholesale company, who had dealt with defendant through salesman taking orders largely from defendant's son, all of which had been shipped to defendant, *held* entitled to recover for merchandise, notwithstanding that complaint made no mention as to any agent.

2. PRINCIPAL AND AGENT—REVOCATION OF AUTHORITY DOES NOT BE-
   COME EFFECTIVE AS BETWEEN PRINCIPAL AND THIRD PERSONS, SUB-
   SEQUENTLY DEALING WITH AGENT AS SUCH, UNTIL THEY RECEIVE
   NOTICE THEREOF.—Revocation of authority does not become effective
   as between principal and third persons, subsequently dealing with
   agent as such, until they receive notice thereof.

3. SALES—EVIDENCE HELD SUFFICIENT TO MAKE CASE FOR JURY,
   WHETHER VIEWED AS CASE OF AGENCY OR ESTOPPEL.—Evidence
   showing that merchandise had been shipped to mother, although
   son was conducting business and was receipting for merchandise
   in mother's name, *held* sufficient to carry case against mother to
   jury, whether viewed as case of agency or estoppel.

Before MAULDIN, SPECIAL JUDGE, McCormick, fall
term, 1924. Affirmed.

Action by Charles D. Carr and O. C. Lee against Mrs.
S. E. Moragne. From a judgment for plaintiffs, defend-
ant appeals.

*Messrs. Joseph Murray* and *F. A. Wise,* for appellant,
cite: *Party dealing with agent must exercise reasonable
care to learn scope of agency:* 117 S. E., 845. *Party deals
with supposed agent at his own risk:* 129 S. E., 213.

*Mr. W. K. Charles,* for respondent, cites: *Question of
agency and ratification of agency one for jury:* 124 S. E.,
645; 122 S. E., 488; 104 S. E., 30. *Principal liable for
note given by apparent agent:* 122 S. E., 669. *Apparent
agency is agency by estoppel:* 31 Cyc., 1233. *Party allow-
ing one to appear to be his agent:* 31 Cyc., 1237. *Party
abandoning business and allowing continued use of revenue
license:* 94 Ala., 346; 10 So., 304. *Allegation of purchase
by principal sustained by proof of purchase by agent:* 73
S. E., 189. *Agency by estoppel:* 79 S. W., 1013; 31 Cyc.,
1237. *Burden of proving limitation of agency and notice
thereof where agent acted within apparent scope of au-
thority:* 75 S. E., 278; 25 S. E., 54.

January 28, 1926.

The opinion of the Court was delivered by MR. ACTING
ASSOCIATE JUSTICE C. J. RAMAGE.

This action was begun in May, 1922, for the purpose of recovering the sum of $233.40 for goods, wares, and merchandise alleged to have been sold by plaintiffs to the defendant. The complaint was in the usual form in such matters. The defendant denied that she was due the plaintiffs anything as alleged in the complaint as being due by the defendant to the plaintiffs. The second paragraph of the defendant's answer is as follows:

"The defendant specifically denies that she, or any one authorized to act for her, purchased any of the goods, wares, or merchandise set out in the verified statement of account attached to and made a part of the complaint, and denies that she, or any one authorized to act for her, ever received or accepted any of the said goods, wares, or merchandise set out in said complaint, and denies that she had any knowledge of any of the matters set out in the complaint."

This action came on to be tried before Special Judge Mauldin and a jury at the October term of the Court of Common Pleas (1924) for McCormick County; and a verdict was found for plaintiffs in the full amount asked for. This appeal is taken from the judgment of the lower Court upon exceptions which will be set out in the report of the case.

The only two questions that we shall consider in passing on this appeal are: (1) Was it error for the Court below to hold the defendant liable by reason of her relations to certain agents, when the complaint set out a cause of action against the defendant personally, and no mention was made in the complaint as to any agent or agents? (2) Was there sufficient testimony to warrant the Judge in submitting the issues to the jury, and was there sufficient testimony to warrant the jury in finding against the defendant?

1. As to the first question raised, we think that this has been settled by many decisions on the subject, as will appear from the following citation from 16

Ency. of Pleading and Practice at page 899, and authorities cited in the note:

"In actions by or against a principal on contracts executed by his agent (with third persons) the contract may be declared on either as having been made by the *principal* or by him through an agent."

See 2 *Corpus Juris,* 904.

"The material fact set forth in the petition is that defendant made the note, not how he made it—whether by his own hand or by that of his agent. The mode of signing it need not have been averred. This material fact would be sustained by evidence, either that the signature was in defendant's handwriting, or that it was made by another duly authorized by him. The question of authority is one of evidence, not of pleading." *Slevin v. Reppy,* 46 Mo., 606. *Bank of Metropolis v. Guttschlick,* 14 Pet., 19; 10 L. Ed., 335.

The case of *Boulware v. McComb,* Harp., page 416, determines this matter. The syllabus is as follows:

"Allegation of a summary process, that parties subscribed an agreement, *with their own proper hands,* was supported by proof that one of them subscribed by his agent."

Judge Johnson states in the opinion:

"Although it might have been more strictly clerical to set out the manner, yet the legal effect of an act is all that is indispensably necessary."

2. We come now to the second question raised above; that is to say, as to the sufficiency of the evidence in this case to fasten liability on the defendant for the purchase price of the goods.

"An agency may be implied from the recognition or acquiescence of the alleged principal, as to acts done in his behalf by the alleged agent, especially if the agent has repeatedly been permitted to perform acts like the one in question." 2 *Corpus Juris,* 443.

·"It has been held that a general agency to do certain acts cannot be implied from the alleged agent having occasionally done acts of a similar nature or from a single isolated transaction. But, on the other hand, it has been held that a single act of an assumed agent and a single recognition of his authority by the principal, if sufficiently unequivocal, positive, and comprehensive in their character, may be sufficient to prove an agency to do other similar acts." 2 *Corpus Juris,* 442.

The trust estate of a female had been under the care of her son as her agent, and the notes given by him had been invariably paid by the mother. She afterward hired the property, a plantation and slaves, to the son; but no notice of the hiring was given to the public. Held, that the estate was liable for the price of provisions furnished to the son for the use of the slaves and the estate. *Montgomery v. Eveleigh,* 1 McCord Eq., 267.

"Authority of a bank teller to accept and discount a certain note for a particular person is shown by the fact that he was accustomed to accept and discount notes for that person and for other persons doing business with the bank, and that such transactions had been approved by the bank officials." *Iowa National Bank v. Sherman,* 17 S. D., 396; 97 N. W., 12; 106 Am. St. Rep., 778.

"Long-continued silence on the part of a principal, when a payment has been ignorantly made to his agent after revocation of his authority, raises a presumption, in favor of the payor that the agent has accounted for the money." *Long v. Thayer,* 150 U. S., 520; 14 S. Ct., 189; 37 L. Ed., 1167.

"One who holds out another as his agent to act for him in a given capacity, and by his habits and course of dealing justifies the inference that such other is authorized to act as his agent, whether it be in a single transaction or in a series of transactions, will not be heard to deny the agency to the prejudice of an innocent party who has been led to

rely upon the appearance of authority in the agent." *Me-cham on Agency,* §§ 83, 84. *Union S. Y. & T. Co. v. Mal-lory, etc., Co.,* 157 Ill., 554; 41 N. E., 888; 48 Am. St. Rep., 346.

"If the question is whether an agent, who had purchased cattle for his principal, had authority to receive them in his possession, the fact that in previous transactions between the same parties the principal had recognized the authority of his agent to receive cattle purchased is material, and a refusal to receive it in evidence is erroneous." *Union S. Y. & T. Co. v. Mallory, etc., Co.* (Ill.), 48 Am. St. Rep., 346.

"A third person may hold a principal on a contract made by an agent in the name of the principal, though he does not at the time know the source of the agent's authority, and in support of the proof of agency he may show the customary authority exercised by the agent sufficient to justify the inference of knowledge and acquiescence on the part of the principal, and thus show the creation of agency in fact." *Murphy v. W. H. & F. W. Cane, Inc.,* 82 N. J. Law, 557; 82 A., 854; Ann. Cas. 1913-D, 643.

"A., the wife of B., orders goods of C., to be sent to the house of D., a relation of A.'s. C., on the following day, sees B., and B. accepts a bill for the price, which he pays at maturity. At the time of paying the bill, B. orders goods of C. to a small amount for himself. A. subsequently orders other goods of C. to be sent to the house of D. Held, that there was evidence to go to a jury of B.'s having so conducted himself as to lead C. to believe that A. had B.'s authority to order the last-mentioned goods."

The above is a decision of Lord Denman, Chief Justice, in the case of *Filmer v. Lynn,* 30 Eng. Common Law Reports, page 397.

In *Todd v. Robinson, Ryan & Moody,* N. P. C., 217, it appeared that the defendant, a tradesman in Yorkshire, had in several instances employed one Womac, who resided in London, as his agent, to order goods to be sent to him

by the plaintiffs (wholesale dealers in London) on credit.
Six parcels so ordered were received and paid for by the
defendant. Womac afterwards, in the defendant's name,
but without his authority, ordered other goods of the plain-
tiffs to be sent by the usual conveyance, and intercepted
them for his own use. The action being brought to re-
cover the price, the defendant denies his liability, but,
under the direction of Abbott, C. J., the plaintiff had a
verdict. His Lordship's language, in addressing the jury,
was as follows:

"The liability of the defendant depends on the question
whether the defendant has by his own acts or conduct
constituted Womac his general agent to order goods. The
authority actually given in such particular instance to
Womac, can (may) only look to the appearances held out
by him; and it is for you to say whether the defendant, by
his own act and conduct, had induced the plaintiffs to be-
lieve that Womac was his agent for the purpose of ordering
these goods. If you think he has so authorized the plain-
tiffs to treat Womac as his agent, then the defendant is
answerable, notwithstanding he may in this particular in-
stance have given Womac no such instructions."

"Apparent or ostensible agency is really agency by es-
toppel, and it is more strictly accurate to say that liability
arises for the acts of such so-called agent, not because
there is any agency, but because the principal will not be
permitted to deny it. " Cyc., Vol. 34, page 1236, and cases
cited in notes.

"The same acts and conduct on the part of a principal
that, when so intended, work an implied appointment, often
estopped the principal to deny an appointment, when no
actual agency was intended. Accordingly, it is a general
rule that, when a principal by any such acts or conduct
has knowingly caused or permitted another to appear to
be his agent either generally or for a particular purpose,
he will be estopped to deny such agency to the injury of

third persons who have in good faith and in the exercise
of reasonable prudence dealt with the agent on the faith
of such appearances." 31 Cyc., page 1237, and numerous
cases cited in the note, among which are *Jenkins v. Hogg,*
2 Tread., Const., 821.

"When a merchant abandons his business and allows
it to be carried on in his name by a relative under authority
of the same revenue license, the same rule of liability ap-
plies for debts afterwards contracted in his name as in the
case of a retiring partner." 31 Cyc., 1237.

See *Gibson v. Snow Hardware Co.,* 94 Ala., 346; 10
So., 304.

The rule in regard to the case of the retiring part-
ner, according to the decisions in South Carolina,
is this: A publication in the newspaper is a suffi-
cient notice for all those who have not had dealings with
the partnership, but in the case of persons who have had
dealings with the partnership, special notice to them is re-
quired; and, where the proper procedure has not been
adopted, the retiring partner will still be held liable for
the debts of the firm. *White v. Murphy,* 3 Rich., 369.
*Hammond v. Aiken,* 3 Rich. Eq., 119. *Planters', etc., Bank
v. Galliott, etc.,* 1 McMul., 209; 36 Am. Dec., 256. *Martin
v. Walton,* 1 McCord, 16.

"As a general rule, a revocation of authority does not
become effective as between the principal and third persons
subsequently dealing with the agent as such until they re-
ceive notice thereof. By conferring the authority the
principal gives third persons, who are aware of it, the
right to deal with the agent according to its terms on the
principal's account, and they have a right to assume, un-
til they are otherwise informed, that the authority con-
tinues as it was originally conferred." 2 *Corpus Juris,*
539, and numerous cases cited in the note, among which are
*Montgomery v. Eveleigh,* 1 McCord Eq., 267, and cases
from practically every state in the Union, as well as from

the United States Supreme Court and the federal courts in support of this quotation.

Now let us see whether or not the testimony in this case is sufficient, under the above authorities, and many others along the same line which might be cited, to hold the defendant liable in this case. The following is a gist of the testimony:

O. C. Lee, one of the plaintiffs:

"Am engaged in the wholesale grocery business. We had some dealings with Mrs. S. E. Moragne, the defendant, in 1920; we shipped her a number of bills in that year; our dealings were through our salesman who was there every week. We received numerous orders from Mr. Moragne; most of them were given to our salesman. (Bills of lading and invoices covering the shipment of goods in question in this case consigned to Mrs. S. E. Moragne from Carr-Lee Grocery Company offered in evidence.) Demand has been made upon defendant for payment of $233.40. She has refused to pay; we received one other order direct from Mrs. Moragne which did not come through our salesman. Our principal business with her was through our salesman which has been going on since July, 1918."

Cross-Examination:

"I said we shipped defendant quite a number of bills in 1920; some of them have been paid. Mr. T. M. Verdery was our representative at the time. We did business with Mrs. S. E. Moragne in 1918, 1919, and 1920. We have never had any dealings with Mrs. S. G. Moragne; we never had any with any one except Mrs. S. E. Moragne during that period of time. There was only one order for goods ordered which was signed by S. E. Moragne; the others were ordered through our salesman. I do not know whose name the business was done in. A young lady was in the store when I went there. I did not know who she was. (Copy of the written order introduced in evidence.) Goods

were shipped in pursuance of this written order and they were paid for."

T. M. Verdery:

"I was employed by plaintiff in 1920. I made sales to Mrs. S. E. Moragne. I sold the goods [in question] to Lester Moragne for Mrs. S. E. Moragne. Mrs. S. E. Moragne originally opened up an account with our firm. We continued to sell to that firm under the name of Mrs. S. E. Moragne. The account was originally opened up with the Carr-Lee Grocery Company by Mrs. S. E. Moragne, and we continued to do business with Mrs. S. E. Moragne. She never gave me notice not to sell anything to Lester Moragne, S. G. Moragne, or any one else. The orders were made out for Mrs. S. E. Moragne. We never had notice that Mrs. S. E. Moragne did not authorize this man to buy goods. The orders in question were not signed by Mrs. S. E. Moragne nor by any one else. I could not tell the exact time when we first opened up an account with Mrs. S. E. Moragne. It has been a long time ago. I have never seen Mrs. S. E. Moragne attending to business in that store. At the time these goods were sold, I rarely saw Mrs. S. E. Moragne at the store, but I have seen her there. My dealings were with Lester Moragne. So far as I was concerned, I was dealing with Mrs. S. E. Moragne through her son, Lester. She never told me to sell to him, but the time I sold they were booked to her originally."

T. B. Parnell, sworn:

"I live at Bordeaux, and am freight agent of the C. & W. C. Railroad. (Duplicate freight bill consigned to S. E. Moragne, Bordeaux, S. C., from Carr-Lee Grocery Company dated April 30, 1920, shown witness.) S. G. Moragne, wife of Lester Moragne, receipted for this freight bill. Freight bills from Hollingsworth Candy Company dated December 8, 1919; H. L. Huggin & Son, dated May 7, 1920; Carr-Lee Grocery Company to S. E. Moragne

dated July 12, 1920; Georgia-Carolina Paper Company, dated August 12, 1920, all consigned to S. E. Morgane. Mr. Moragne always hauled the freight, and none had ever been delivered to any one else, and all consignments to Mrs. S. E. Moragne and others he gave me his receipt for them. I delivered these goods to Mr. Moragne; he was always acting in that capacity ever since I had been there. He had been receipting for goods to Mrs. S. E. Moragne. S. G. Moragne had stuff from other concerns. These papers are from Carr-Lee Grocery Company to S. E. Moragne and signed by S. G. Moragne, and, if I delivered it to a Negro, I would go around and get the signature, and here. is S. E. Moragne and signed by S. G. Moragne.

"Q. State whether practically all goods were received for Mrs. S. E. Moragne? A. S. G. Moragne receipted for all freight for his mother or any one else by the name of Moragne, and he hauled the freight and gave his signature for delivery. Q. Why did you deliver the goods to S. G. Moragne when they were shipped to Mrs. S. E. Moragne? A. He had been hauling the goods, and I thought he was acting under some authority for her. Q. How long had you been doing that kind of business? A. I have been and all former agents before me for five or six years. Q. These goods went to the store? A. He carried them up the hill; I suppose he carried them to the store."

On a motion for a nonsuit, his Honor ruled:

"There is some evidence in this case that will have to go to the jury. The witness testified that he opened up an account with Mrs. S. E. Moragne and was doing business with her, and that he continued to do business with her, and that shipments were made to her, and that he received no notice of the change in the firm, and I think that is a question for the jury."·

The defendant, S. E. Moragne, testified as follows:

"Have lived at Bordeaux since 1870; ran a mercantile business there after my husband's death. I had nothing to

do with the store, but received all my mail. (Letter introduced in evidence from Grier, Park & Nicholson, dated June 29, 1921, demanding payment of the account in question.) I do not know that I received this letter; I have not received any letters from Carr-Lee Grocery Company inclosing invoices since I stopped running the store. I do not recall telling Mr. Verdery that I wished to open an account with his company. No; I do not recall that I did *not since I went out of business.* I did not authorize any one to receipt freight bills for goods consigned to me.

"Q. *What authority did S. G. Moragne have to sign your name?* A. They ordered the goods; I did not order them. Q. You knew that they ordered them? A. I knew they ordered goods for the store. Q. What authority did S. G. Moragne have to sign your name? A. I do not know anything about it. Q. How did you account for the fact that you received none of your mail? A. I might have seen that, but I do not remember it. Q. Why did you not notify these people that you did not owe them anything? A. I have receipts for everything I owed them. Q. If that letter had come to you from Grier, Park & Nicholson, why did you not notify them that you did not owe that money? A. *I did not owe it; my son should have looked after it himself or his wife.* Q. *Did you ever notify Carr-Lee Grocery Company not to advance credit on your name?* A. No, sir. Q. You never did? A. No, sir. Q. Did you ever meet Mr. Verdery on any of his trips to the store? A. Yes, sir. Q. Did you talk with him about buying goods? A. When I ran the store I did, and I paid him everything I owed him. A. L. Moragne is my son; S. G. Moragne is his wife."

A. L. Moragne, sworn:

"Q. What about this letter from Grier, Park & Nicholson? A. I got that letter myself; my mother never did see it. Q. Why did you not give it to her? A. Because I have got a hundred different letters with different initials

and names for the store. I have opened a number of letters with Mrs. S. E. Moragne's name on them. They come by various names, but I knew it was all for the store. I opened a letter from Grier, Park & Nicholson, but I did not write them that my mother did not owe them that bill because at that time everything had gone to the bad, and every one was scrapping for a nickel. Q. And you wanted A. L. Moragne to owe it? A. I knew he owed it. Q. Because she was worth it, and you were not, but you wanted her to get out of it. (Question not answered.) Q. Who authorized you to sign the freight bills? A. I knew they were for me. I had the invoices. Q. How were these particular invoices directed? A. I expect they were for S. E. Moragne. Q. And you signed S. G. Moragne's name? A. I did not sign A. L. Moragne's name, because S. G. Moragne was the name I did business in. Q. And they were shipped to S. E. Moragne? A. Some of the goods. Q. These particular goods? A. Yes, sir. Q. And you forged your wife's name? A. Yes, sir; I forged my wife's name on .it. Q. And you opened Mrs. S. E. Moragne's mail, and you saw these accounts? A. Yes, sir. Q. And you never said anything about it to the party who shipped the goods? A. I have not paid this claim. Q. Why was S. E. Moragne's name signed to that letter of 1920? A. My wife ordered that stuff and sent the money for it. Q. Why did she not sign her own name? A. I do not know why she signed the name of S. E. Moragne. Q. You did not know they were shipped in the name of Mrs. S. E. Moragne, but you knew that a letter signed with the name of Mrs. S. E. Moragne would bring the goods? A. I receipted for this freight at the depot, and the stuff was shipped to Mrs. Moragne. I receipt for all of the stuff to the store."

A motion for a directed verdict was made, and it appears in the exceptions that a motion for a new trial was also made, all of which were refused by his Honor. His

Honor made a very clear, able, and impartial charge to the jury, which presented the legal issues in a very fair and adequate manner, and we do not see that anything was left undone by the Judge below to let the jury understand what they were passing on. There was abundant testimony, as will be seen above, to carry the case to the jury, whether the case be viewed as one of agency or estoppel, and we see no error in the action of the presiding Judge in allowing the verdict to stand. The law bearing on this matter and the facts have been set out at some length, and we are satisfied that the facts measure up to the standards laid down in the above-mentioned authorities.

It is the judgment of this Court that the judgment of the lower Court be affirmed.

MESSRS. JUSTICES WATTS and COTHRAN, and MESSRS. ACTING ASSOCIATE JUSTICES J. H. MARION and R. O. PURDY concur.

MR. CHIEF JUSTICE GARY did not participate.