[Civil No. 3531. Filed October 28, 1935.]

[50 Pac. (2d) 878.]

WELLS FARGO AND COMPANY, EXPRESS, S. A., a Corporation, J. O. ELLIS and SOUTHERN PACIFIC RAILROAD COMPANY OF MEXICO, a Corporation, Appellants, v. LOUISE TRIBOLET, Appellee.

Mr. Duane Bird and Mr. Thomas L. Hall, for Appellants Express Company and J. O. Ellis.

Mr. Francis M. Hartman, for Appellant Railroad Company, and Mr. Guy V. Shoup and Mr. C. O. Amonette, of Counsel.

Messrs. Mathews & Bilby and Mr. T. K. Shoenhair, for Appellee.

ROSS, J.—This is an action in trover. The plaintiff, Louise Tribolet, and her assignor, San Antonio Land Company, a Mexican corporation, bought eleven cars of tomatoes in Sonora, Mexico, for shipment to and sale in the United States and Canada. It is alleged in the complaint that such eleven cars were delivered by such owners to defendant Southern Pacific Railroad Company of Mexico, between December 10 and 20, 1932, to be transported over its line of

railroad from Navojoa, Sonora, Mexico, to Nogales, Arizona; that upon arrival at Nogales, Arizona, the owners were lawfully entitled to the possession of said tomatoes, but that upon their arrival at such point the defendants Southern Pacific Railroad Company of Mexico, Southern Pacific Company, Wells Fargo & Co., Express, S. A., the Wells Fargo Company of Arizona, J. O. Ellis, B. S. Butcher, and J. J. Egan, and all of them, unlawfully took, converted, and disposed of said tomatoes to their own use; that the owners upon the arrival of the tomatoes at Nogales, Mexico, and again upon their arrival at Nogales, Arizona, demanded of said defendants, and each of them, the possession of said tomatoes, and that defendants, and each of them, unlawfully and willfully refused to deliver such possession; that at the time and place of such conversion the tomatoes were of the net value of $10,395 to the owners; that subsequent to such conversion the San Antonio Land Company duly assigned to plaintiff all its interest in and to said tomatoes and its right of action against defendants on account of said conversion.

In their answers the various defendants set out the following defenses:

The Southern Pacific Company, after stating that it owned and operated various lines of railroad in Arizona and the United States and was engaged in interstate transportation and that one of its lines in Arizona connected with the Southern Pacific Railroad Company of Mexico at the international boundary between Mexico and the United States at Nogales, alleges that eight cars of tomatoes were shipped from Navojoa, Sonora, from December 14th to the 16th, by plaintiff to Wells Fargo & Co., consignee, at Nogales, Arizona, and three, on or about December 19th, to Wells Fargo & Co., Tucson, Arizona; that said shipments were made under written contracts

by and between plaintiff and Southern Pacific Railroad Company of Mexico known as bills of lading, and that in each of said bills of lading was this provision: "This shipment when exported is subject to all conditions shown on bills of lading of participating carriers." That one of the provisions of the uniform bills of lading of the Southern Pacific Company is:

"As a condition precedent to recovery, claims must be filed in writing with the receiving or delivering carrier, or carrier issuing this bill of lading, or carrier on whose line the loss, damage, injury or delay occurred, within nine months after delivery of the property (or in case of export traffic, within nine months after delivery at port of export) or, in case of failure to make delivery, then within nine months after a reasonable time for delivery has elapsed; and suits shall be instituted against any carrier only within two years and one day from the day when notice in writing is given by the carrier to the claimant that the carrier has disallowed the claim or any part or parts thereof specified in the notice. Where claims are not filed or suits are not instituted thereon in accordance with the foregoing provisions, no carrier hereunder shall be liable, and such claims will not be paid."

It is alleged that neither plaintiff nor the San Antonio Land Company ever made or filed any claim in writing for loss of tomatoes with the Southern Pacific Company or the Southern Pacific Railroad Company of Mexico.

In addition to the above defense, this defendant filed a general denial; also set out in its answer that said cars of tomatoes were by the consignee, Wells Fargo & Co., diverted to different points in the Middle West and Eastern United States.

The Southern Pacific Railroad Company of Mexico filed the same answer and denial as the Southern Pacific Company.

Plaintiff in her reply denies that the tomatoes were consigned to Wells Fargo & Co. as consignee; alleges that four of the cars were consigned to the Pacific Brokerage Company for plaintiff, and the other seven delivered to the Southern Pacific Railroad Company of Mexico with instructions to ship them to plaintiff at Nogales or Tucson, Ariz. She alleges that defendant Southern Pacific Railroad Company of Mexico, acting in concert with the other defendants, refused to ship the seven cars of tomatoes to her, but forced and compelled her to consign them to Wells Fargo & Co. as consignee, and that because of the nature of tomatoes, they being ripe and perishable, she consigned them as the Southern Pacific Railroad Company of Mexico demanded. She alleges that she was not permitted to have possession of the bills of lading, but that they were, according to her information and belief, sent to Wells Fargo & Co., Express, S. A.; that the provision in bills of lading requiring the filing of a claim in writing with the carrier has no application, but that if it does she complied with such requirement; and further that the Southern Pacific Company is estopped to set up the defense because when she complained to it of her loss it told her to take it up with the Wells Fargo & Co., Express, S. A.; and that she did so and within the time limit filed a claim with said express company.

The same reply was filed to the answer of the Southern Pacific Railroad Company of Mexico.

The defendants Wells Fargo & Co., Express, S. A., the Wells Fargo Company of Arizona, J. O. Ellis, B. S. Butcher, and J. J. Egan answered by general denial.

Before the trial the case was dismissed as to defendant Butcher.

At the close of the case, on motion of defendants, the court instructed a verdict in favor of the defendants Southern Pacific Company, the Wells Fargo Company of Arizona, and J. J. Egan.

The verdict was instructed as to the Wells Fargo Company of Arizona on the ground that such company was not in existence at the time of the alleged wrong (and as to J. J. Egan, an executive officer of such company for the same reason). The reason for the instructed verdict in favor of the Southern Pacific Company will be stated in the course of the opinion.

The jury returned a separate verdict against the Southern Pacific Railroad Company of Mexico, Wells Fargo & Co., Express, S. A., and J. O. Ellis for the sum sued for, or $10,395, and judgment was rendered thereon against said defendants. These defendants have appealed from the order overruling their motion for a new trial and from the judgment.

We shall hereafter refer to the Southern Pacific Company as the "SP Company," the Southern Pacific Railroad Company of Mexico as the "SP Company of Mexico," the Wells Fargo & Co., Express, S. A., as the "Express Company," and the other defendants by name.

There are two separate briefs and assignments of error: one by the SP Company of Mexico and one in which the Express Company and its agent Ellis join. Some of the assignments raise identical points, and others are limited to the case of the appellant making them.

Before taking up and examining the errors complained of, we make the following preliminary statement: The vegetable growers of the state of Sonora, Mexico, in the year 1932 appointed the Express Company as their agent for the purpose of distributing and marketing their vegetables, and under such agency, with the co-operation of the SP Company of

Mexico, such agent took control of the eleven cars of tomatoes involved and directed their movement to various markets in the United States and sold them, or such of them as they could find buyers for, paying all the freight, crossing charges, brokerage commissions, import duties, etc., amounting to $11,781.21, or $1,747.55 more than was realized from the sale of the tomatoes.

The plaintiff, denying the right of the Express Company to control the marketing and distribution of her tomatoes and insisting that the Express Company and all others who aided it in the handling or transporting of the tomatoes were guilty of converting them, brought this action.

The defendants' contention was that the plaintiff was aware that the Express Company was to control the marketing and distribution of the tomatoes at the time she bought them and agreed thereto.

The extraordinary power of controlling and regulating the sale of the tomatoes by the growers thereof, to the extent of dictating how and where and through whom the buyers of their tomatoes might market them, is claimed to be exercised under authority of a law enacted by the Congress of the State of Sonora on June 30, 1932, and approved by the Governor of such state on July 2, 1932. In pursuance of said law, the growers and producers of fresh vegetables, particularly of tomatoes, in the region of the Mayo River, in the state of Sonora, Mexico, which region embraces the cities of Navojoa and Huatabampo, organized a co-operative agricultural association, under the name of Association of Vegetable Producers of the Mayo Agricultural Region, designed to operate to their mutual benefit through orderly and unified production, distribution, and sale of their crops. This association adopted a constitution and by-laws. Under the state law and the constitution and by-laws

of the association, the Mayo association was confederated with like associations in the state of Sonora, with the object of controlling the volume and type of vegetables produced and of imposing upon the distribution and sale of its products such restrictions and regulations as would redound ultimately to the greatest general welfare. Membership in the association was voluntary, but encouraged as each member was compensated by a subsidy given by the state through the association.

The provisions of the law and of the constitution and by-laws of said association of present concern are that the members had to recognize the association as the exclusive agent for sales. Also the association had the right to regulate distribution and sale, and to impose a tax on the privilege of purchase. The association had complete control of the buying and selling of the produce of its members. The Express Company was appointed sales agent of the Sonora confederation, of which the Mayo association was a member.

It appears from the evidence that the idea of constituting the Express Company as exclusive sales and distributing agent of the confederation of associations in Sonora originated with General Plutarco Elias Calles, as we know from contemporary history one of the then dominating citizens of that state and of the Republic of Mexico. He submitted the idea to Mr. Elmer Jones, president of the Express Company, and Mr. Walter Douglas, chairman of the board of directors of the SP Company of Mexico, and other employees of these two corporations, and with his approval these officers and employees worked out a plan under which the Express Company was to have exclusive handling of the products of the organized vegetable growers of the state of Sonora. In other words, these public utilities, having been called upon

by General Calles to co-operate with him and the confederation of associations to carry out the objects and purposes of the law, consented and agreed to co-operate and adopted as a means to effectuate such purpose the plan of placing the control of distribution in the hands of the Express Company and fixed its compensation, to be paid by the shipper, at $25 a car for such service. The Express Company had no agent or representative at Navojoa, where the shipments originated. The billing of the tomatoes was attended to by plaintiff's son, Harry Tribolet, acting as her agent, and by the agent of the SP Company of Mexico and the agent of the Mayo association.

We accept what was done by the parties hereto in Mexico as authorized under the laws of that jurisdiction. We may not question the legality or soundness of the policy of the laws of that nation or the state of Sonora. The state could provide that the producers of vegetables might organize and through their organization impose restrictions, not only on the acreage and kind of production, but also on the marketing and distribution of their crops, and to that end appoint agents with exclusive power and right to do the marketing and require persons buying vegetables from the association for resale to sell and market the products thus bought through such agency.

The above is only a general outline of the facts, but sufficient to give an idea of the background of this litigation.

The record is very voluminous; the testimony covering 1,419 pages, the abstract 311, and the briefs 592. Most of the trial was devoted to an effort on the part of the defendants to show that plaintiff expressly or tacitly consented to have her tomatoes distributed and marketed by the Express Company and directed that they be consigned to said company for such purpose, and on the part of the plaintiff to show that

she bought tomatoes with no restriction on her distributing and marketing them herself. There is no disputing the fact that the SP Company of Mexico came into the possession of the tomatoes lawfully and with the consent of plaintiff and that it transported them, according to its agreement with plaintiff, to the end of its line, for which service plaintiff agreed to pay it.

Upon this premise, we examine the assignments or such of them as we deem necessary to the determination of the case.

It is at once seen that the law governing the duties and liabilities of the carrier and that applicable to the Express Company and Ellis, its agent, as consignee, is or may not be the same. We shall first consider the appeal as it affects the SP Company of Mexico, and then as it affects the Express Company and Ellis. The following facts we state as established by the pleadings, or the evidence, or both, beyond any dispute or question:

The plaintiff as the owner, from December 14th to 19th, inclusive, delivered to the SP Company of Mexico eleven cars of tomatoes at Navojoa, Mexico, for shipment, four of such cars being consigned to the Pacific Brokerage Company at Tucson, Arizona, and seven of them to the Express Company at Nogales, Arizona, as shown by the bills of lading; that the SP Company of Mexico accepted such freight from plaintiff and transported it over its lines from Navojoa to the end of its track at the boundary between the United States and Mexico, at Nogales, Mexico; and there, as provided in the bills of lading, delivered the goods to its connecting carrier the SP Company to be transported to the points of destination mentioned in said bills of lading, or as the same might be diverted. The bills of lading were, at Navojoa, attached to the waybills and at Nogales,

Mexico, were delivered by the SP Company of Mexico to the respective consignee, the Pacific Brokerage Company, and the Express Company. They at no time came into the possession of the plaintiff.

The plaintiff now claims that notwithstanding the bills of lading mentioned the Pacific Brokerage Company and the Express Company as consignees, and the destinations as Tucson and Nogales, Arizona, she as the owner of the goods had a right under the law to their possession, and that it was the duty of the carrier upon her demand to deliver such possession over to her. There is evidence supporting her allegation of a demand upon defendant at Nogales, Mexico, and Nogales, Arizona, for the possession of said goods.

We think as a general proposition of law the owner of goods, whether he or someone else be designated as consignee, may stop the goods en route and demand their possession before they reach their destination, and that the carrier, especially if it have knowledge of such ownership, is legally bound to surrender the possession to the owner. 10 C. J. 261, § 376. However, before the SP Company of Mexico was under any duty to deliver the goods to plaintiff, she must have either paid or tendered payment of the freight charges and other expenses, incurred by the defendant under the laws of Mexico, for transporting goods to the boundary line between Mexico and the United States This is expressly provided for in the bill of lading in the following words:

"The amount of freight charges as well as expenses incurred by the Company, will be paid upon delivery of shipment to consignee and will be subject to correction."

We take it that the word "consignee," as used above, includes the owner who has exercised, or under-

taken to exercise, his right of taking possession of goods between point of consignment and destination, or at destination, especially where he is also the consignor. It is evident that it was intended that the one receiving the goods from the carrier should pay the freight charges and other expenses, if any, before he could lawfully demand possession. It is also clear that the carrier must be paid freight and other charges upon delivery of goods to the consignee. Who shall make the payment is not stated, but it must be made by somebody "upon delivery of shipment to consignee."

It is said of a provision in a bill of lading somewhat similar to the above:

"We think that provision in no way relieves the consignor or shipper of his liability to pay the freight if the carrier sees fit to look to him for his compensation. That stipulation was plainly designed for the benefit of the carrier, and to make expressly definite his rights against the consignee; it expressly makes the consignee liable for the freight, and asserts the carrier's right to have payment for his services before delivery of the goods transported, but it does not relieve the shipper or consignor from his contract to pay the freight. The contract of the consignor and that of the consignee are not considered to be inconsistent with each other." *Northern Pac. Ry. Co.* v. *Pleasant River Granite Co.*, 116 Me. 496, 102 Atl. 298, 299. See, also, 4 R. C. L. 857, § 310.

What the rights of the carrier, in the absence of this agreement, would have been under the laws of Mexico, in the way of a lien on goods for the freight and other expenses, we cannot say. The rule under the common law, which is the rule throughout this country, is that the carrier has a lien on the goods for freight and expenses and may retain the goods until tendered or paid such freight and expenses. It is stated as follows:

"Independently of contract a common carrier has a right of detention or lien on goods delivered to it for carriage which attaches as soon as the carrier's liability as such begins, and continues until the freight charges are paid. Until such time as the entire freight is paid a carrier is not bound to part with any of the goods, and an offer to give good security for the payment of freight is not payment." 4 R. C. L. 868, § 320.

 In the absence of a showing to the contrary, we assume the Mexican law is the same as ours.

 Plaintiff claims that the defendant carrier, by reason of a surety bond she gave it, extended credit to her for any shipments over its and connecting lines. The bond referred to is entitled "Guarantee Bond on Freight Shipments" and was executed to the SP Company of Mexico by plaintiff and a surety company. It recites that the carrier would receive from plaintiff and her agents and transport goods for her "without first exacting payment of the transportation, freight and/or other charges on any of said shipments," which freight and other charges, according to the tariff provisions or other regulations, are required to be prepaid or guaranteed. The bond shows on its face that this credit was extended to plaintiff for her "accommodation." As we construe this bond, it was taken as a guaranty that the freight and other charges, when not collected in advance, would at all events be paid. It is in addition to the remedy of the carrier to enforce its lien by retaining possession of goods until the freight and other charges have been paid, another remedy which it may, if necessary to secure payment of such charges, also pursue. It was never intended to abrogate or cancel the provision in the bill of lading to the effect that, "The amount of freight charges as well as expenses incurred by the Company, will be paid upon

delivery of shipment to consignee," but is a supplemental or additional remedy open to the carrier if necessary. It waives only prepayment of charges. It is not the only source available to the carrier from which to collect his freight and other charges and does not purport to be.

■■ Plaintiff also contends that because the defendant carrier, when she demanded possession of the tomatoes told her to go to the Express Company, the consignee and possessor of the bills of lading, and make her demand, and did not mention or ask for the payment of freight and other charges, it waived its right to have them paid before delivery of the goods. The general rule is that the carrier must deliver the goods to the consignee, and the Express Company being the consignee it was but natural that the plaintiff consignor should have been directed by the agents of the carrier to see or confer with such consignee concerning the surrender or cancellation of the bills of lading, so that the carrier's liability would be terminated upon the delivery of the goods. 10 C. J. 255, § 368 et seq. If the plaintiff had presented the bills of lading and offered to pay freight and other charges, or perhaps under the circumstances if she had offered to pay such charges, the carrier, knowing that she was the owner of the goods, would have been justified in surrendering possession. However, the plaintiff knew as well as the defendant carrier that she owed for the freight and other charges and that she must pay them before she would be entitled to delivery of the goods. It was incumbent on her to pay or tender payment of such charges before she could require their delivery. The conduct of the carrier the plaintiff complains of as a waiver of the payment of freight and other charges seems to us was only a necessary pre-

cautionary step before delivering the goods to anybody. Indeed, the contract, as set out in the bills of lading, provides that the shipper may change the destination of shipment, or the name of the consignee, before delivery to the consignee; but in both cases the bill of lading must be returned to the carrier canceled by the signature of the shipper, who must also pay all expenses incurred by the operation.

But it is said by plaintiff that defendant did not plead in its answer that its refusal to deliver possession of goods was because the freight and other expenses had not been paid or tendered, and for that reason the carrier waived such payment or tender.

The defendant by its general denial denied that plaintiff was entitled to the immediate possession of the goods and, in the face of such denial, it became the affirmative duty of plaintiff to show that she had paid or tendered the freight charges and other expenses. How could she be entitled to the immediate possession as long as she owed the carrier such charges? What it was necessary for plaintiff to allege and prove to entitle her to the relief asked is well stated in *Union Stockyard & Transit Co.* v. *Mallory, Son & Zimmerman Co.,* 157 Ill. 554, 41 N. E. 888, 889, 48 Am. St. Rep. 341, as follows:

"In an action of trover, which is a possessory action, the plaintiff must recover upon the strength of his own title, and not upon the weakness of his adversary's title; and he must show, not only a tortious conversion of the personal property by the defendant, but also that at the time of the alleged conversion he had the right of property, general or special, in the chattels converted, and also the possession, or a right to the immediate possession, thereof. There must be a concurrence both of the right of property, general or special, and of the actual possession, or the right to immediate possession, and this concurrence must exist at the time of the conversion."

█ Under the defendant's general denial it was permissible for it to show any fact refuting any fact the plaintiff was required to prove in order to establish a cause of action, including the ownership and right of possession of the tomatoes. 65 C. J. 94, §§ 157, 158.

The evidence conclusively shows that defendant's possession of the goods terminated at the boundary line between Arizona and Mexico. Its line extends only to such boundary. It could not enter the United States and therefore could not be, and was not, in possession of the shipments at any time, or at all in Arizona where the conversion is alleged to have occurred. It could not therefore be held liable for the alleged conversion unless its contract with plaintiff as contained in the bills of lading makes it liable. The bills of lading are headed "Export Bill of Lading," and subdivision 15 thereof reads as follows:

"15. In case this bill of lading should cover a shipment consigned to a point not included in the lines of this Company, the responsibility of the latter ceases as soon as shipment is delivered to connecting line which is to carry shipment beyond, in which case the shipper agrees to settle up with the new carrier, waiving the benefits mentioned in Article 577 of the Commercial Code."

If this means anything, it is that the plaintiff as the shipper would accept the connecting carrier, upon whose line her goods were lost, destroyed, or converted, as the party to make settlement with. There is no suggestion that this provision of the bill of lading is not legal and binding under the laws of Mexico.

█ The grounds upon which the court based its instruction to the jury to return a verdict in favor of the SP Company were that neither the plaintiff nor her assignor, San Antonio Land Company, had

within nine months after the delivery of goods to the carrier, or at all, filed with the initial carrier or the SP Company a written claim or demand. This was done upon the theory that although the shipment originated in Mexico, it was nevertheless an interstate shipment governed by the provisions of the Interstate Commerce Act and amendments thereto (49 U. S. C. A., § 1 et seq.) and the provisions of the uniform bill of lading. That such a shipment is interstate is settled by the decision in *Galveston, Harrisburg & San Antonio Railway Company* v. *Woodbury*, 254 U. S. 357, 41 Sup. Ct. 114, 115, 65 L. Ed. 301, wherein it is said of a shipment originating in Canada and thence through the states, in answer to contentions that the Interstate Commerce Act did not apply:

"A carrier engaged in transportation by rail *to* an adjacent foreign country is, at least ordinarily, engaged in transportation also *from* that country to the United States. The test of the application of the act is not the direction of the movement, but the nature of the transportation as determined by the field of the carriers' operation. This is the construction placed upon the act by the Interstate Commerce Commission."

And the transportation being interstate it was necessary to file written claim within the time provided in the bill of lading before an action for conversion could be maintained. *Georgia, F. & A. R. Co.* v. *Blish Milling Co.*, 241 U. S. 190, 36 Sup. Ct. 541, 60 L. Ed. 948; *Davis* v. *John L. Roper Lumber Co.*, 269 U. S. 158, 46 Sup. Ct. 28, 70 L. Ed. 209; *Chesapeake & O. R. Co.* v. *Martin*, 283 U. S. 209, 51 Sup. Ct. 453, 75 L. Ed 983.

Since the bill of lading issued by the SP Company of Mexico provided that, "This shipment (the tomatoes) when exported is subject to all conditions shown on bills of lading of participating car-

riers," the provision of the uniform bill of lading, which was the kind used by the SP Company, requiring the filing of a written demand with one of the connecting carriers within nine months after the shipment was delivered, must be complied with when the *situs* of the injury is laid in Arizona. The liability of the SP Company of Mexico for conversion in Arizona is governed by the same rules as the liability of the domestic carrier operating under the uniform bill of lading, because that was the agreement. If the action was not maintainable against the SP Company because of the failure to make written claim within the time provided in the bill of lading, and certainly it was not under the decision of the Supreme Court in the Woodbury case, *supra*, it was not for the same reason maintainable against the SP Company of Mexico.

Plaintiff, however, says that the provision of the uniform bill of lading requiring a written claim to be filed with the carrier within nine months after delivery of shipment is not applicable to the facts in this case, for the reason that tomatoes were not *exported* with her consent but against her will. Four of the cars were consigned by her to brokers of her own choosing at Tucson, Arizona, and seven of them to the Express Company at Nogales, Arizona. Plaintiff in her brief says:

"Appellee did not ask to change the point of destination so far as the railroad company is concerned."

This shows conclusively that plaintiff intended the tomatoes for exportation. Of course, she might change her mind after the shipments were commenced and stop them short of the billed destination; but, as we have seen, if she wanted the carrier to give her possession of the goods she should have paid or tendered the freight and other charges. She should at least have offered to pay for carriage service up

to the time and place of demand. The plaintiff refuses to be bound by the allegations of her complaint, to the effect that the conversion was in Arizona, and also assumes it to be the law that all she had to do to stop and possess cars in transit was to demand them of the carrier.

She also says that the cases uniformly hold that the provision in the bill of lading requiring written notice of claim to the carrier is not applicable where the carrier itself converts the property. This is the rule of some of the state courts, 10 C. J. 335, § 487, but the court whose decisions construing the uniform bill of lading is binding upon us has ruled to the contrary. *Georgia, F. & A. R. Co.* v. *Blish Milling Company; Davis* v. *John L. Roper Lumber Company; Chesapeake & O. R. Company* v. *Martin, supra.*

The SP Company of Mexico at the close of the case moved for an instructed verdict, and the court's refusal to grant the motion is assigned as error for the reason and upon the grounds that plaintiff had made out no case against the defendant carrier, in that she had failed to show a conversion of the tomatoes by the defendant; in that plaintiff did not pay, or offer to pay, defendant the freight and other charges for transporting tomatoes from Navojoa, Mexico, to Nogales, Mexico; in that the undisputed and uncontroverted evidence shows that the line of defendant's railroad as also its functions terminate at Nogales, Mexico, whereas the allegation of the complaint is that the tomatoes were converted at Nogales, Arizona; and in that plaintiff had filed no written claim with the carrier as provided in the bill of lading.

From what we have found the law to be, it is clear that the motion should have been granted and, the plaintiff failing to make out a case against the Southern Pacific Railroad Company of Mexico, the judgment should have been in its favor. The case is re-

·manded with directions that judgment be entered for this defendant.

From the foregoing statement of the facts it will be seen that neither the Express Company nor Ellis, its agent, ever had actual possession of the tomatoes. The agents of the SP Company of Mexico were in possession of the bills of lading until the shipment reached Nogales, Mexico, where they delivered such bills of lading to the Express Company or its agents. Until the shipment reached Nogales, Mexico, and the bills of lading were delivered over to the Express Company the latter did not have even symbolic possession of the tomatoes. Plaintiff alleged and proved that she demanded possession of the tomatoes of the Express Company and Ellis at Nogales. The only things these defendants had and could possibly have delivered to her were the bills of lading, *indicia* of ownership and right of possession. If these symbols of possession had been delivered by these defendants to plaintiff, and plaintiff had gone with them to the SP Company of Mexico and said, "Here I have the bills of lading for the eleven cars of tomatoes and I demand that they be turned over to me," without paying or offering to pay the freight and other charges from Navojoa to the Mexican boundary, the carrier could have lawfully refused to surrender the shipments. The right to the possession of the tomatoes was in the railroad until its freight and other charges were paid or tendered. The possessor of the bills of lading, if the owner or consignee, could acquire the right of possession by paying, or offering to pay, the carrier its freight and other charges, and not otherwise. However one may look at it, the consignee's right of possession of the tomatoes and the owner's right of possession of the tomatoes were subordinate to the right of possession

of the carrier until its freight and other legitimate charges were paid or tendered.

There is no question, and has been none at any time, as to the ownership of the tomatoes. That they belonged to the plaintiff is unquestioned. But ownership, in an action of trover, is not enough. The plaintiff must show in addition thereto that he is entitled to the immediate possession of the goods. This the plaintiff has failed to do, and for that reason the motion of the Express Company and Ellis for an instructed verdict at the close of the case should have been granted.

These conclusions obviate the necessity of our passing upon the many other assignments of error.

On remand judgment will be entered for defendants Wells Fargo & Co., Express, S. A., and J. C. Ellis.

LOCKWOOD, C. J., and McALISTER, J., concur.