266 F.2d 249
 Robert GOULD, d/b/a Robert Gould Company, Plaintiff-Appellant & Cross-Appellee,
v.
HIRAM WALKER & SONS, INC., a Corporation, and
Hiram Walker, Incorporated, a Corporation, Defendants & Counter-Claimants, and
Irving H. Lake et al., Interpleaded Counter-Defendants-Appellees & Cross-Appellants.
 No. 12414.
 No. 12415.
 United States Court of Appeals Seventh Circuit.
 April 23, 1959.
 Rehearing Denied May 26, 1959.
 
 Edward R. Dorr, Cincinnati, Ohio, Harry E. Witherell, Peoria, Ill., for Gould, Gallagher, Dorr & Manley, Cincinnati, Ohio, Davis, Morgan & Witherell, Peoria, Ill., of counsel.
 Robert G. Day, Clarence W. Heyl, Julian B. Venezky, Jay J. Alloy, Chester L. Anderson, John E. Cassidy, Herbig Younge, Cassidy & Cassidy, Peoria, Ill., for Hiram Walker & Sons and Irving H. Lake.
 Before SCHNACKENBERG, PARKINSON and KNOCH, Circuit Judges.
 KNOCH, Circuit Judge.
 
 
 1
 On September 19, 1940, at a New York Tax Commission Warrant Agent's sale, Robert Gould purchased, subject to prior sales and outstanding equities, all the right, title and interest of Pennsylvania Whiskey Distributing Corporation (later known as Kent-Darby, Ltd.) herein called "Pennsylvania", in (inter alia) a contract to purchase 1,367 barrels of whiskey from the Hiram Walker Companies, herein called "Walker", on which partial payment had been made and, in addition, warehouse receipts representing 833 barrels of whiskey. Of the total 2200 barrels only 1608 are involved in the matter now before us.
 
 
 2
 In 1941 Gould brought this action to compel delivery by Walker upon payment by Gould of charges for storage, insurance, taxes, and the balance due on the purchase contract. Walker answered Gould's demand alleging the receipt of notices of other claims from the numerous interpleaded counter-defendants (herein called "Tavern Keepers") each based on alleged prior purchases of the whiskey in question from Pennsylvania.
 
 
 3
 It was stipulated that prior to September 1940, Pennsylvania sold each of the Tavern Keepers varying numbers of barrels of whiskey; and that in each instance a part, at least, of the agreed purchase price had been paid Pennsylvania. Specific proof of the exact agreed prices and amount of payment made was reserved for later accounting.
 
 
 4
 Gould contended that he had acquired the entire legal and equitable title to the whiskey and that, as a matter of law, he took subject only to payment of the unpaid balance of the purchase price, and equities of which he had legal notice at the time of his purchase.
 
 
 5
 The only contested issue at that time was whether he took subject to or free from the rights of Tavern Keepers.
 
 
 6
 On appeal, this Court (7 Cir., 1944, 142 F.2d 544) concluded that Gould took title subject to the claims of the Tavern Keepers and remanded the cause to the District Court for further proceedings consistent with that finding.
 
 
 7
 The parties then stipulated as to the amounts paid by each Tavern Keeper and the number of barrels covered by each payment.
 
 
 8
 However, under authorization of the District Court's decree of April 14, 1943 (subsequently reversed on appeal as heretofore indicated) Gould had taken delivery and disposed of the whiskey. It thus became the duty of the District Court to assess damages.
 
 
 9
 The Tavern Keepers were all retailers, not blenders or distillers of liquor. Under the law they were prohibited from accepting delivery in barrels and could do so only in bottled form. Damages were assessed by the District Court on the basis of the wholesale value of each barrel of whiskey in bottled form, less all amounts payable as contract balances, storage and other charges, Federal Excise Taxes, and cost of bottling.
 
 
 10
 An exception was made of two Tavern Keepers who were found not to have paid Pennsylvania the full amount of their agreed purchase price. They were awarded solely the return of the amounts they had paid.
 
 
 11
 Gould asserts that all the Tavern Keepers should have been awarded damages solely in return of the amounts they had paid. His theory is that all were technically in default in completing payments and were tardy in asserting their rights. Gould argues that each Tavern Keeper should receive only the amount he actually paid, less an allocable share of the payments made by Gould to "protect" the property.
 
 
 12
 The whiskey would have been deliverable to the Tavern Keepers only after Pennsylvania had paid the Federal Excise Taxes, bottled the whiskey and been reimbursed for its cost. Gould thus contends that the Tavern Keepers owed Pennsylvania about $200 per barrel. This is about what would have been owed to Pennsylvania, had Pennsylvania paid the Federal Excise Taxes, Walker's charges for storage and insurance, shipping charges and bottling cost, and delivered the whiskey to the Tavern Keepers in bottled form. These things, however, were not done. In computing the value of each of the barrels, in bottled form, the District Judge gave full consideration to all these charges which the Tavern Keepers would have had to pay Pennsylvania at such time as they sought delivery of their whiskey in bottled form from Pennsylvania.
 
 
 13
 It was undisputed that for some time prior and subsequent to April, 1943, when Gould took possession of the whiskey, war conditions caused a great imbalance in demand and supply of whiskey, production of which ceased during the war years. Further, because of the great price differential between Office of Price Administration "ceilings" for bulk whiskey and bottled whiskey, very little whiskey could be purchased in bulk. As a matter of self interest, owners of bulk whiskey had it bottled before sale to take advantage of the differential.
 
 
 14
 Thus the Tavern Keepers could not have purchased other whiskey in bulk in 1943 and had it bottled. They would have had to buy bottled whiskey at the higher prices then in effect.
 
 
 15
 Gould appeals on the ground that the District Court has made an unjust award of damages. The District Judge made no allowance for profit and based damages only on the differences between what it would have cost each Tavern Keeper to obtain a barrel of whiskey in bottled form (with taxes and charges paid) and what it would have cost him to get his own whiskey, of which Gould had taken possession, in bottled form with all taxes, contract balances, charges, etc., paid.
 
 
 16
 The Tavern Keepers have also appealed from the District Court's failure to allow interest. They contend that the measure of damages for conversion of personal property properly includes interest from the time of conversion.
 
 
 17
 Gould characterizes the interest of the Tavern Keepers as less than full ownership title. It is, however, unquestioned that Pennsylvania owned the warehouse receipt barrels outright (subject only to storage and insurance charges, etc.) and owned the contract barrels subject to such charges and balance of the purchase price due Walker. Purchase orders were signed by each Tavern Keeper. Pennsylvania issued each Tavern Keeper a whiskey warehouse certificate to evidence his interest. The purchase orders stated:
 
 
 18
 "Title to the whiskey described in this order and covered by Warehouse Certificate shall remain in seller until payment of purchase price and any notes in connection therewith have been paid. * * *"
 
 The certificates also provided:
 
 19
 "The title to the whiskey covered by this certificate shall pass only upon full payment of the purchase price both in cash and the payment of any notes that shall be given in connection with the purchase price."
 
 
 20
 The certificates did not specify the agreed purchase price. The purchase orders did.
 
 
 21
 With the exception of two Tavern Keepers, who had not paid the full purchase price, as noted above, each Tavern Keeper, prior to the New York Tax Sale, paid Pennsylvania in full the purchase price set forth in the purchase order, and title to the bulk whiskey had passed from Pennsylvania to the respective Tavern Keepers. Gould, in acquiring Pennsylvania's right, title and interest at the Tax Sale acquired no title in the barrels of whiskey specified in the purchase orders of these Tavern Keepers.
 
 
 22
 Gould argues that something remained to be done to put the whiskey in a deliverable state, and that title therefore did not pass until the whiskey was bottled.
 
 
 23
 He quotes from Section 19 of the Uniform Sales Act, Rule 2 (Chapter 121½, Sec. 19, Illinois Revised Statutes):
 
 
 24
 "Where there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done."
 
 
 25
 However, the rules from which Gould quotes are preceded by an introductory paragraph:
 
 
 26
 "Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer."
 
 
 27
 and the preceding section (Sec. 18) provides:
 
 
 28
 "(1) Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.
 
 
 29
 "(2) For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case."
 
 
 30
 Title may pass before delivery if the parties so intend. (Sec. 34)
 
 
 31
 Here the provisions in the purchase orders and certificates with reference to delivery after bottling did not set the time for passage of the title, but represented an attempt to comply with the federal regulations prohibiting delivery of whiskey in bulk to unauthorized persons.
 
 
 32
 In Kahn v. Rosenstiel, D.C.S.D.,N.Y., 1924, 298 F. 656 (cited by Gould) plaintiff's assignor contracted to buy cases of whiskey bottled in bond, f. o. b. At the time of the contract, both buyer and seller had permits to buy and sell, respectively, which were subsequently found to be void. The buyer sought to recover his down payment. The Court held that until the contract was performed, there should be a locus poenitentiae, and found the contract unexecuted. The Court said (298 F. at page 657) that the parties do not presumptively mean to pass title till the seller has finished his part of the performance, which there required the seller to bottle and ship the whiskey in cases bottled in bond.
 
 
 33
 In the case before us, as we construe it, when Pennsylvania went out of business, the Tavern Keepers, having full title, could have taken the whiskey stored in Walker's warehouses (on payment of Walker's charges, etc.) and had the warehouseman bottle it for them, at their expense, or had it delivered to one authorized to receive whiskey in bulk.
 
 
 34
 Gould also cites Ely & Walker Dry Goods Co. v. Adams Mfg. Co., 2 Cir., 1939, 105 F.2d 906, which we do not find helpful. A creditor sought delivery of netting in possession of a trustee in bankruptcy. The Court found (105 F.2d at page 908) that the creditor's purchase order and payment in advance, was a contract to sell future goods by description, to be manufactured or acquired by seller after making the contract to sell, and that the title did not pass until goods answering the description were unconditionally appropriated to the contract, put up and ticketed as described in the contract. The netting found on the premises of the bankrupt had not been so appropriated, put up, or ticketed.
 
 
 35
 Gould denies that Tavern Keepers had a right to possession on which a claim of conversion can be based, citing British-American Tobacco Co., Ltd., v. Federal Reserve Bank of N. Y., 2 Cir., 1939, 105 F.2d 935; and Union Stockyard & Transit Co. v. Mallory, Son & Zimmerman Co., 1895, 157 Ill. 554, 41 N.E. 888. Both are distinguishable on facts.
 
 
 36
 In the British-American case, the Court held that it was not conversion when the Federal Reserve Bank refused to turn over gold bullion to an owner who would be required, by statute and executive order, to return it at once.
 
 
 37
 The Stock Yard case concerned Samuel Fleischman, a cattle buyer, long an agent for Bussell, a Detroit purchaser, who customarily bought on letter or wire instructions which came to Fleischman from Detroit. Zimmerman, of Mallory, Son & Zimmerman Co., with whom Fleischman negotiated, gave Fleischman an order on the Stock Yard Co. to deliver the cattle as instructed by Fleischman. Fleischman took the order and improperly resold the cattle to Holmes & Pattison. He endorsed the order: "To Holmes & Pattison. Bussell-S. Fleischman." When Bussell refused to pay for the cattle which he had never received, Mallory, Son & Zimmerman Co. sought to recover from the Stock Yard Co. The Court, in reversing and remanding for error in instructing the jury, said (157 Ill. at page 570, 41 N.E. at page 893) that it was not conversion if a bailee, entrusted with possession merely, transferred possession according to the directions of the person from whom he received it.
 
 
 38
 One whose property is taken under a court order is entitled to restitution if the order is later reversed. Having sold the property erroneously awarded him, Gould must account for its value. Bank of United States v. Bank of Washington, 1832, 6 Pet. 8, 31 U.S. 8, 8 L.Ed. 299; Ure v. Ure, 1906, 223 Ill. 454, 79 N.E. 153; Hays v. Cassell, 1873, 70 Ill. 669.
 
 
 39
 The market value or cost to a retailer of one barrel of whiskey in bottles in April, 1943, has been stipulated. The Court deducted therefrom the various amounts of taxes, bottling cost, storage charges, etc., which the Tavern Keepers would have had to pay to secure delivery of their own whiskey in bottles.
 
 
 40
 We cannot agree that damages as computed by the District Court contain contingent or speculative elements. In the conduct of their business the Tavern Keepers could sell bottled whiskey only. It would be unrealistic to assume that when whiskey was in short supply they would have sold it in bulk to a distiller at the proportionately low O.P.A. ceiling price for bulk whiskey rather than have it bottled (for which facilities were available in the vicinity) for use in their business. As bulk whiskey was not readily available the case before us differs from that in Illinois Central R. Co. v. Crail, 1930, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699, cited by Gould. That case concerned failure to make delivery of part of a carload shipment of coal. The buyer had lost no sales and purchased no coal at retail to replace the shortage. The Court of Appeals for the Eighth Circuit, 31 F.2d 111 reversed judgment for the wholesale value of the coal, holding that judgment should have been entered for the retail value of the coal shortage as it was less than a carload in quantity. The Supreme Court, however, said (281 U.S. at page 63, 50 S.Ct. at page 181) that recovery should be for the actual loss, damage or injury only.
 
 
 41
 It appears to us that the District Court in the case before us gave judgment for no more than the full actual loss shown.
 
 
 42
 Gould contends that the Tavern Keepers are not entitled to interest under the Illinois Interest Act because of the unliquidated nature of their claims and because this is not a true case of conversion as the Tavern Keepers had no immediate right to possession because of the Federal Bottling Requirements. The Tavern Keepers concede that this would be true at law, but assert that this is a case in which equity should allow interest. Cases cited in support of their contention, however, dealt with fraud, a wilful attempt to avoid a clear obligation, breach of trust, and waste committed on farm lands, none of which occurred here.[1]
 
 
 43
 In view of the entire record here, the District Court could well come to the conclusion that equity did not warrant allowance of interest in this matter.
 
 
 44
 We find no error in the judgment of the Court below.
 
 
 45
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Duncan v. Dazey, 1925, 318 Ill. 500, 149 N.E. 495 (title to property acquired by fraud); Groome v. Freyn Engineering Co., 1940, 374 Ill. 113, 28 N.E.2d 274 (written contract providing time of payment of commissions coincided with time money was received by appellant); Lebold v. Inland Steel Co., 7 Cir., 1942, 125 F.2d 369 (a majority stockholder "dissolved" a corporation to appropriate the corporation's business entirely to itself, to the detriment of minority stockholders); Lytle v. Payette-Oregon Slope Irrig. Dist., 1944, 175 Or. 276, 152 P. 2d 934, 156 A.L.R. 894 (waste on farm lands during period of possession of purchaser under judicial sale for delinquent assessments later held void.)