**SOUTH CENTRAL BANK AND TRUST COMPANY, Plaintiff,**

**v.**

**CITICORP CREDIT SERVICES, INC., Defendant.**

No. 92 C 3585.

United States District Court, N.D. Illinois, E.D.

Dec. 21, 1992.

Phillip Leon Stern, Sherman Paul Marek, Freeman, Freeman & Salzman, Chicago, IL, for plaintiff.

Alan L. Fulkerson, Brian W. Norkett, Riordan, Larson, Bruckert & Moore, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

On June 1, 1992, South Central Bank and Trust Company ("South Central") filed a four-count complaint alleging breach of contract, breach of an agency agreement, and two claims of conversion against Citicorp Credit Services, Inc. ("CCSI"). On July 20, 1992, CCSI filed a motion to dismiss the complaint for failure to state a claim pursuant to Fed.R.Civ.P. ("Rule") 12(b)(6). For the following reasons, CCSI's motion is granted in part and denied in part.

## BACKGROUND

"A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Gorski v. Troy*, 929 F.2d 1183, 1186 (7th Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). When dealing with a motion to dismiss, the court assumes the truth of all well-pled factual allegations and makes all possible inferences in favor of the plaintiff. *See Janowsky v. United States*, 913 F.2d 393, 395 (7th Cir.1990); *Rogers v. United States*, 902 F.2d 1268, 1269 (7th Cir.1990). Thus, for purposes of this motion, we accept as true the allegations contained in South Central's complaint.

In October 1989, South Central and First Chicago Corp. National Bank ("First Chicago") entered into a "Bankcard Agent Bank Agreement" (the "Agreement"), pursuant to which South Central agreed to act as First Chicago's agent in soliciting merchants to purchase services provided by First Chicago in connection with processing "Visa" and "Mastercard" bankcard credit charges. Authority to accept or reject merchant applicants was vested solely in First Chicago. In negotiating the Agreement, First Chicago represented to South Central that it would fully investigate, among other things, the financial condition of all merchants whose applications it received and reject those applicants who were not qualified. South Central executed the Agreement based in part on this representation.

After the Agreement was entered into, Alex Polishuk, the officer at First Chicago with primary responsibility for its relations with South Central, repeatedly assured South Central that First Chicago was investigating, among other things, the financial condition of each merchant whose application was submitted to it by South Central. Further, First Chicago reassured South Central that it would reject those not qualified. First Chicago did in fact conduct full investigations of merchant applicants and reject those not qualified. After the investigation, Polishuk would inform South Central if merchant applicants were accepted or rejected and the reasons for any rejections. South Central, with First Chicago's and Polishuk's knowledge and consent, did not conduct an independent investigation of the financial condition of merchants whose applications it submitted to First Chicago.

In order to process merchants, First Chicago provided South Central with blank

merchant application forms that South Central would complete for interested merchants and submit to First Chicago for approval. These applications did not request financial information about the merchant. Instead, the applicant, by his signature, expressly authorized First Chicago, but not South Central, to obtain financial information about the applicant.

On or about May 4, 1990, First Chicago assigned the Agreement and all of its rights, duties and obligations thereunder to CCSI, including the exclusive authority to accept or reject applicants. At or around the time of the assignment, Polishuk left First Chicago and became an assistant vice-president of CCSI, resuming his duty of the person with primary responsibility for relations with South Central under the Agreement. After the assignment, CCSI continued to accept the standard merchant application forms provided to South Central by First Chicago. Again, these application forms did not request financial information about the merchant, but instead, authorized only CCSI, as the principal bank, to obtain financial information about the applicant.

Neither Polishuk nor any other CCSI officer ever told South Central that CCSI would not continue First Chicago's practice of fully investigating, among other things, an applicant's financial condition, or that it would not continue First Chicago's practice of rejecting unqualified merchants. South Central relied on CCSI to continue these practices.

On or about March 6, 1991, South Central submitted to CCSI for approval a merchant application for American–European Express, Inc. ("AEE"), which operated a luxury passenger rail service between Chicago, New York and Washington, D.C. The application form used for the transaction was the First Chicago application form. South Central did not undertake its own investigation into the financial condition of AEE. Instead, it relied on CCSI to investigate the financial condition before accepting AEE's application.

If CCSI had investigated AEE, South Central contends that the investigation would have revealed that at the time AEE entered into the merchant agreement with South Central, AEE had a negative net worth of $10 million, having deteriorated from a negative $3 million the year before; current assets of $300,000, down from $900,000 in 1989; current liabilities of $3,700,000, up from $2,800,000 in 1989; a net loss in 1990 in excess of $7 million, up from about $3 million in 1989; and $26,000 in cash. CCSI never told South Central that CCSI did not undertake a thorough investigation of, among other things, AEE's financial condition. Thus, South Central alleges it was not aware that AEE was not qualified, or that it had a precarious financial condition.

CCSI approved AEE's application, and based on that approval, South Central entered into the requisite agent bank/merchant agreement with AEE. Pursuant to those agreements, AEE electronically reported "Visa" and "Mastercard" charges to CCSI and AEE was paid the amount of those charges by CCSI directly. Over the course of this relationship between CCSI, South Central, and AEE, AEE paid CCSI $12,187.34 for its services, of which CCSI retained $11,849.95, and paid its agent South Central $337.39.

On June 21, 1991, an AEE train derailed in Indiana, substantially impairing AEE's ability to provide future rail service to its customers. Despite its impairment, AEE continued to accept reservations for future services through October 1991 and continued to accept credit card charges in advance payment for those services. AEE electronically reported these charges to CCSI and AEE received immediate payment for these charges from CCSI. AEE has since ceased operating, and cardholders who charged deposits for future services not rendered are entitled to a refund, or "chargeback," of the amounts charged. AEE advised South Central on November 29, 1991, that the total amount of chargebacks due cardholders for unperformed services is $152,772.75. CCSI reimbursed the cardholders.

On December 18, 1991, CCSI ceased wiring funds to South Central's bank for paper sales slips submitted by South Central.

CCSI continued to process sales slips submitted by South Central and receive the proceeds, but placed those proceeds in an account newly established at CCSI for the purpose of recouping money refunded to AEE customers for services not received. To date, CCSI has withheld $173,386.27 in paper sales slip proceeds, which South Central contends exceeds any possible AEE-related loss to CCSI by more than $20,000. CCSI has used $110,940.63 of the $173,386.27 to fund chargebacks to AEE customers. The balance of the account is $62,445.64. CCSI has rejected all demands by South Central for the return of the $173,386.27 or the release of the $62,445.64.

## DISCUSSION

### A. Count I

Count I of the complaint alleges that CCSI breached the Agreement by failing to disclose AEE's precarious financial condition to South Central, or alternatively, by recklessly failing to conduct an adequate investigation of AEE's financial condition. CCSI argues that Count I must be dismissed because the Agreement itself is in direct conflict with South Central's allegation that the Agreement imposes a duty upon CCSI to undertake investigations into the financial backgrounds of South Central's merchants.

The Agreement expressly requires that: C. Before entering into a merchant agreement with a merchant, you (South Central) must comply with the following minimum requirements:

1) Ascertain from available records, independent reports and other appropriate means that the prospective merchant is financially responsible and that there is no significant derogatory background information about any of the principal(s) of the business.

2) Conduct an actual on-site inspection of the business. If sales slips will be generated as a result of either mail or telephone orders, a detailed description of the business must be obtained.

The Agreement also provides that it is the duty of the agent bank under the agreement to develop, maintain and service its relationships with its merchants.

We agree that the express terms of the Agreement clearly place the duty on South Central to investigate the financial condition of a merchant before submitting that merchant's application to the principal bank. However, South Central alleges that First Chicago, at the time it entered into the Agreement and thereafter, agreed orally to assume the responsibility to investigate merchant applications, including the financial condition of the merchant, and reject those not qualified. Further, South Central alleges that CCSI was aware of First Chicago's oral modification and that CCSI continued First Chicago's policy of investigating the applicants. Thus, South Central argues CCSI breached its duty under the Agreement as modified.

CCSI argues that as an assignee it cannot be charged with First Chicago's alleged oral modification of the Agreement because it never expressly assumed the obligation at the time of the assignment. Although this is true as a general rule, an assignee may, by his conduct, acquiesce to the modification. *Corrugated Metal v. Industrial Comm'n,* 184 Ill.App.3d 549, 132 Ill.Dec. 739, 744, 540 N.E.2d 479, 484 (1989). We concluded that South Central has alleged sufficient facts to support a finding that CCSI's alleged conduct after the assignment was consistent with South Central's assertions that CCSI had knowledge of First Chicago's oral modification of the Agreement and had assumed the duty from First Chicago to investigate the financial conditions of the merchants.

According to the complaint, Polishuk, the officer at First Chicago with primary responsibility for its relations with South Central, repeatedly assured South Central after the agreement was entered into that First Chicago was investigating each merchant whose application was submitted to it by South Central and that First Chicago would reject those not qualified. Based on this representation, and with First Chicago's consent, South Central alleges that it did not undertake an independent investigation.

When the Agreement was assigned to CCSI, Polishuk left First Chicago to become assistant vice-president at CCSI. Once at CCSI, Polishuk resumed his position as the officer with primary responsibility for CCSI's relations with South Central. Thus, the same man who represented to South Central that First Chicago was assuming the responsibility to investigate the financial condition of the merchants was also the man running the show for CCSI. The court finds it hard to believe that CCSI was not aware of how First Chicago conducted business with South Central when the same man was in charge of managing the Agreement for both banks.

Further, CCSI, under the direction of Polishuk, continued to accept First Chicago's merchant application forms. These applications allegedly do not request financial information about the merchant. Instead, the forms expressly authorized the principal bank (now CCSI) but not the agent bank, to obtain financial information about the applicant.

Given Polishuk's knowledge that First Chicago assumed the responsibility to investigate the merchants before approving their applications and the continued use of First Chicago's application forms, we are unable to conclude that South Central has failed to allege facts to support a claim for breach of contract. Thus CCSI's motion to dismiss Count I is denied.[1]

## B.  Count II

■ In Count II, South Central alleges that the Agreement created an agency relationship between CCSI and South Central which imposed a duty on CCSI to either investigate and/or inform South Central of adverse financial information concerning AEE. Consequently, South Central alleges that CCSI, as principal, had a duty to inform its agent, South Central, of the risk of pecuniary loss associated with acting as CCSI's agent.

To support its argument that CCSI owed a duty under agency law to fully inform South Central in acting as its agent, South Central relies on Restatement (Second) of Agency § 435 (1965). Section 435 provides:

> Unless otherwise agreed, it is inferred that a principal contracts to use care to inform the agent of risks of physical harm or pecuniary loss which, as the principal has reason to know, exist in the performance of authorized acts and which he has reason to know are unknown to the agent.

Since CCSI did not investigate the financial condition of AEE or inform South Central of AEE's financial collapse after it became aware of AEE's financial troubles, South Central argues that CCSI breached its duty as principal.

CCSI argues that § 435 applies only in the absence of an agreement to the contrary, and that in this case, the Agreement provides that it is South Central's duty, and not CCSI's, to investigate, inspect and monitor its merchants. As stated above, South Central has alleged facts to support a claim that CCSI assumed the duty to investigate and monitor through an oral modification of the Agreement. Thus, South Central has alleged facts to support its claim of breach of duty under the principals of agency law. CCSI's motion to dismiss Count II is also denied.

## C.  Counts III and IV

Even though AEE was unable to provide services to Mastercard and Visa cardholders who paid for reservations with a credit card, AEE continued to accept payment for reservations through October 1991. By October 1991, AEE had electronically submitted to CCSI and been reimbursed for charges totaling $152,722.75. Since AEE never preformed the services for these customers, these cardholders were entitled to a credit to their account, or "chargeback"

---

1. CCSI argues that the oral modification is unenforceable because the modification alters the general purpose and intent of the contract. We disagree. Under the Agreement, South Central is responsible for soliciting merchants to deposit their Visa and Mastercard bankcard sales slips with CCSI, and CCSI is responsible for servicing these accounts. The fact that the oral modification shifted the responsibility to investigate the merchants before accepting their applications does not undermine the general purpose of the Agreement.

for the unperformed services. CCSI reimbursed the cardholders for these charges.

According to the Complaint, CCSI ceased paying South Central on December 18, 1991 for paper slips submitted by South Central. None of these sales slips were related to AEE. Although CCSI processed the slips, CCSI deposited the proceeds in a special account for the purpose of recouping money refunded to AEE customers for services not received. In other words, CCSI offset other money due to South Central for sales slips to cover its losses in the AEE deal. As of March 5, 1992, CCSI had withheld from South Central and placed in the special account $173,386.27 in sales slips proceeds.

South Central contends that the Agreement does not authorize CCSI to withhold money due for sales slips submitted by South Central to offset chargebacks or for any other purpose. Thus, South Central alleges that CCSI has "wrongfully and without authorization assumed control, dominion and ownership over this amount in specifically identifiable money to which South Central has the sole right of ownership and immediate, absolute and unconditional possession." CCSI has moved to dismiss Counts III and IV on grounds that South Central has failed to state a claim for conversion.

■ The Restatement of Torts defines "conversion" as follows:

1) Conversion is an intentional exercise of dominion and control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

Restatement (Second) of Torts § 222A (1965). The Supreme Court of Illinois has stated that " '[a] conversion is an unauthorized act, which deprives a man of his property permanently or for an indefinite time * * *.' " *In re Thebus*, 108 Ill.2d 255, 91 Ill.Dec. 623, 625, 483 N.E.2d 1258, 1260

(1985) (quoting *Union Stock Yard & Transit Co. v. Mallory, Son, & Zimmerman Co.*, 157 Ill. 554, 563, 41 N.E. 888 (1895)). An action for conversion only lies for personal property which is tangible, or at least represented by or connected with something tangible. *Id.* (citing 18 Am.Jur.2d *Conversion* § 9 (1965)). Since money is a fungible good, "an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money." *Id.*

■ However, money may be the subject of conversion if it is capable of being described as a specific chattel. *Id.* According to Restatement (Second) of Torts § 242, "[w]here there is conversion of a document in which intangible rights are merged, the damages include the value of such rights."[2] For instance, Illinois courts recognize a cause of action for conversion of commercial paper, such as a check, on the theory that the intangible right to money is merged into a specific document (i.e. the check). *See In re Oxford Marketing, Ltd.*, 444 F.Supp. 399 (N.D.Ill.1978). Thus, money in the form of commercial paper is a specific chattel that can be converted.

■ South Central argues that paper sales slips, such as the ones in question, are routinely passed between merchants, agent banks, principal banks and the Visa and Mastercard Systems in exchange for contemporaneous payments of money. Once South Central submits the slips to CCSI, South Central argues that it is entitled to immediate payment from CCSI of the amount specified on the paper slip. Consequently, South Central argues that the paper slips and the proceeds due for the slips merge together creating a tangible property right. Thus, South Central argues that the slips and the specific amount of money due to South Central for the slips, represent specific chattels that can be converted.

---

**2.** According to Restatement (Second) of Torts, § 242 is applicable to promissory notes, bonds, bills of exchange, share certificates and warehouse receipts. It is also applicable to insurance policies and to savings bank books. Some courts have also applied § 242 to cases where the converted document is not in itself a symbol of the rights in question, but is merely essential to their protection and enforcement (i.e. a bank book).

Although Illinois courts do recognize a cause of action for conversion of commercial paper, the paper slips are not commercial paper. The agreement expressly placed several conditions that must be met before South Central is entitled to the proceeds from the paper slips. The right to reimbursement under the Agreement is not absolute. Since the Agreement imposes restrictions on the terms of payment for the paper slips, the paper slips cannot be considered commercial paper.[3] Consequently, the money involved in this suit cannot be considered a specific chattel. Since South Central is unable to state a claim for conversion, CCSI's motion to dismiss Counts III and IV is granted.

## CONCLUSION

For the reasons stated above, CCSI's motion to dismiss Counts I and II pursuant to Rule 12(b)(6) is denied. CCSI's motion to dismiss Counts III and IV for failure to state a claim is granted.

---

3. For example, the agreement expressly provides that CCSI does not have to reimburse South Central for any slips that are deficient for any one of the reasons enumerated in schedule A of the Agreement.